IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1041, consolidated with,
No. 04-1598 T

(Judge Bruggink)

LYMAN F. BUSH, et al.,

Plaintiffs

v.

UNITED STATES,

Defendant

DEFENDANT'S REPLY BRIEF

I. No partner level factual determination was required in this case.

At issue this case is whether the assessments of the deficiencies for plaintiffs' 1985-1987 tax years required "a non-computational factual determination at the partner level." *Olson v. United States*, 172 F.3d 1311, 1318 (Fed. Cir. 1999). If not, then the assessments at issue for those years are valid. Plaintiffs have not identified any portion of the deficiencies assessed by the IRS for plaintiffs' 1985-1987 tax years that required a non-computational partner level factual determination. In fact, the IRS required no additional information to determine those deficiencies. Rather, plaintiffs raise hypothetical situations, such as the possibility of an

"innocent spouse" defense, none of which apply in this case, and are thus irrelevant. (P. Reply at 19.) *See Olson*, 172 F.3d at 1319.

Paragraphs 2-4 of the Closing Agreements provide that plaintiffs can claim losses in 1985-1987 to the extent of their capital contribution to each of the partnerships in issue, which amount was agreed and stated in the Agreements to be $50,000.00.[1] As shown in the at risk computations for each partnership, in 1984, the first year of the Closing Agreements, the IRS allowed the first $50,000.00 of partnership losses and then disallowed all losses claimed after that date. (Dx. 7, 8.) As set forth in the Notices of Adjustment and related explanations, in order to determine the deficiencies in plaintiffs' 1985-1987 tax years, all the IRS did (or needed to do) was disallow the partnership losses originally claimed in each of those years and recompute the items on plaintiffs' original returns accordingly. (Px. 12-14; Dx. 4-6.) It is thus clear that the deficiencies at issue in this case were the result of a computational adjustment, and, pursuant to § 6230(a), no notice of deficiency was required before the deficiencies could be assessed.[1] *Olson*, 172 F.3d at 1318.

The bulk of plaintiffs' argument in their reply brief (at 8-11) is devoted to a discussion of the same irrelevant jurisprudence cited in their opening brief – *i.e.*, cases in which the issue

---

[1]The pertinent terms of both the Cinema 84 and LWM Closing Agreements at issue in this case are the same. (Px. 10, 11.) Therefore, the term "Closing Agreements" refers to both of those closing agreements. The Closing Agreements contained provisions regarding adjustments to the at risk amount in the event of partnership income (¶ 8), additional cash contributions (¶ 7), or cash payments on partnership notes (¶¶ 9, 18). However, none of those provisions apply to 1985-1987. Paragraphs 7, 9, and 18, by their terms, apply only to tax years after 1989. (Px. 10, 11.) Since neither the Cinema 84 partnership, nor the LWM partnership, earned any net income in 1985-1987, paragraph 8 has no application in those years.

[1]Citations to the Internal Revenue Code are to the provisions of the Code in effect during the years in issue.

would have required the Court to determine in the first instance the amount of or the taxpayer's entitlement to non-partnership substantive affected items. As noted in defendant's opening brief, each of those cases addressed the question of whether the Tax Court in a TEFRA case has jurisdiction to decide those non-partnership substantive affected items. (D. Brief at 14.) Those cases held that under the facts in each case the "resolution of the tax consequences of certain affected items may require additional factual determinations to be made at the partner level" and, therefore, the Tax Court in a TEFRA case had no jurisdiction to decide those matters. *N.C.F. Energy Partners v. Commissioner*, 89 T.C. 741, 745 (1987)(emphasis added); see also, *Hambrose Leasing v. Commissioner*, 99 T.C. 298, 312 (1992); *Roberts v. Commissioner*, 94 T.C. 853, 861 (1990). None of the cases cited or discussed by plaintiffs involved the situation present in this case, where no additional factual determination is required because all relevant factual issues were resolved by the closing agreements they entered into with the IRS.

In *N.C.F.*, for example, the Tax Court dismissed from a TEFRA case a partner's claims regarding his liability for the negligence penalty in § 6659, because the partner's negligence clearly involved a partner level factual determination. In *Roberts*, the Tax Court dismissed from a TEFRA case a partner's claim regarding his at risk amount because the partner's amount at risk was controlled by side agreements with third parties not involved in the Tax Court proceeding, and thus required a factual determination in a partner level proceeding. In *Hambrose Leasing*, the Tax Court concluded that the amounts at risk "cannot be conclusively determined without the benefit of additional information which often is not available at the partnership level." 99 T.C. at 311. None of those cases involved Closing Agreements in which the taxpayers had stipulated and resolved all critical factual issues related to the application of the

§ 465 at risk rules, which is the situation present here.[4]

In contrast, the jurisprudence cited by defendant does involve assessments based on adjustments arising out of a closing agreement. *Olson*; *Bob Hamrick Chevrolet v. United States*, 849 F.Supp. 500, 521 (W.D. Tx. 1994); *Cummings v. Commissioner*, T.C. Memo. 1996-282, 1996 WL 334418 at 5 (1996). Each of those cases involved situations where a taxpayer claimed that an assessment pursuant to a closing agreement was not valid because a notice of deficiency was required before the additional tax could be assessed. In each case the taxpayer's claim was denied because the court found that the taxpayer had executed a closing agreement that resolved the critical factual issues related to the determination of the taxpayer's additional tax liability. Those cases stand for the proposition that if no non-computational partner level factual determination was required to determine the deficiency in question, then no notice of deficiency is needed before that deficiency can be assessed.

The case most analogous to this one is *Olson*. Plaintiffs seek to distinguish *Olson* based on the fact that it did not involve the application of § 465. (P. Reply at 16-17.) However, the taxpayers in *Olson* advanced exactly the same arguments advanced by plaintiffs here, only with respect to carrybacks and carryforwards of tax credits. *Olson*, 172 F.3d at 1317-18. In *Olson* the taxpayer had executed a closing agreement that resolved the critical factual issues. The Federal Circuit rejected the taxpayer's arguments that partner level factual determinations were required,

---

[4]The Closing Agreements in this case resolved both the amount at risk and the source of the amount at risk (the partner's cash contributions). Therefore, this case is distinguishable from *Roberts* and *Hambrose Leasing*, where the questions of whether the debt assumed by the taxpayer was recourse or non-recourse, and the source of the partner's contribution to the partnership had not been determined.

because the closing agreement resolved all the pertinent factual issues. (172 F.3d at 1318):

> Indeed, despite the fact that the IRS may need assistance as to the derivation of certain figures on the tax returns, no individualized factual determination takes place as to the correctness of the originally declared figures or any other factual matter such as the state of mind of the taxpayer upon filing. The critical question of fact - that is, the amount of tax credits improperly claimed as carrybacks and carryforwards [read "amount at risk"] - has already been resolved and stipulated to in a settlement agreement among the parties. The application of that stipulated fact to the tax returns in question requires only computational action.

In this case the critical question of fact involved – the amount plaintiffs were at risk pursuant to § 465 – was also resolved and stipulated in the Closing Agreements. All that was required was for the IRS to compute the additional tax resulting from those agreements. In this case, the IRS did not even require any "assistance as to the derivation of certain figures on the tax returns" in order to compute the additional tax owed in 1985-1987, resulting from the Closing Agreements. Under *Olson*, no notice of deficiency was required before that additional tax could be assessed.

II. <u>Any overpayments in 1988, 1990-1993, and 1995 are irrelevant</u>.

Plaintiffs argue that a partner level factual determination is required in the years in issue because the plaintiffs filed claims for refund for 1988, 1990-1993, and 1995, which claims "offset" any deficiencies determined by the IRS in 1985-1987. (P. Reply at 22-23.) They contend that the tax overpayments they claimed in those later tax years in effect reduce the deficiencies to be determined for 1985-1987. (P. Reply 22-23.) Plaintiffs argument is directly contrary to the annual accounting concept provided in § 441. Section 441(a) provides that the computation of taxable income is based on the taxpayer's taxable year, which is defined in § 441(c) as "the annual accounting period on the basis of which the taxpayer regularly computes his income." A taxpayer's tax liability for a given tax year is dependent solely on the items of

income and deduction occurring that year.[5] Therefore, an overpayment in 1988 has no application in the determination of whether there is a deficiency in 1987.

Plaintiffs' argument appears to be based on the word "offset" in paragraph 15 of the Closing Agreements, as they repeat that word throughout their reply brief. Apparently plaintiffs contend that "offset" as used in the Closing Agreements means that the determination of plaintiffs' tax liability in 1985-1987 is somehow based on the overpayments in 1988, 1990-1993, and 1995. Plaintiffs' interpretation of the term "offset" in paragraph 15 of the Closing Agreements is contrary to the plain language of that provision.

Paragraph 15 in each of the Closing Agreements states (emphasis added):

> Any refund claim attributable to the operation of this agreement shall be deemed timely filed and shall be allowed if it is filed with the IRS within one year of the execution of this agreement by the Commissioner of Internal Revenue. Any refund claim so submitted pursuant to this paragraph within 120 days after the execution of this agreement on behalf of the Commissioner of Internal Revenue shall be allowed as an offset pursuant to IRC §§ 6402(a) and 6601(f) against any tax deficiencies resulting from this agreement.

The offset referred to in paragraph 15 is the "offset pursuant to IRS § 6402 (a)." Section 6402(a) provides (emphasis added):

> In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsections (c), (d), and(e) refund any balance to such person.

The specific reference to § 6402(a) in paragraph 15 of the Closing Agreements makes it clear that the term "offset" in that paragraph means applying any overpayments occurring in

[5] There are exceptions to the annual accounting period, such as the application of carrybacks or carryforwards. However, none of those exceptions apply to the determination of plaintiffs' tax liability in 1985-1987.

1988, 1990-1993, and 1995, as credits against the deficiencies assessed for 1985-1987. Therefore, even if plaintiffs were correct that the IRS did not properly allow their refund claims for 1988, 1990-1993 and 1995, the validity of the deficiency assessments for 1985-1987, the only issue raised in plaintiffs' current motion, would not be affected. Any overpayments in later years would only relate to the manner in which those deficiencies are satisfied, not to the amounts of the assessments themselves. (*See* transcript of account for plaintiffs' 1985 tax year, reflecting application of an overpayment credit from 1988.) (Px. 1 at 002.) .

Plaintiffs argue that if they had been issued notices of deficiency for their 1985-1987 tax years they could have raised the 1988, 1990-1993 and 1995 refund claims as offsets in a Tax Court proceeding contesting the deficiency. (P. Reply at 5.) However, in reviewing a deficiency determination for a particular tax year the Tax Court has no jurisdiction to determine whether there was any overpayment or underpayment in any other tax year. § 6214(b). Therefore, even if the IRS had issued notices of deficiency for 1985-1987, the Tax Court could not have determined whether there were overpayments in the later tax years that should be applied as credits against the deficiencies in 1985-1987.

In any event, plaintiffs incorrectly represent that the IRS did not take action on their claims for refund for 1988, 1990-1993 and 1995, and that those claims were attributable to the operation of the Closing Agreements. Plaintiffs were allowed a refund in the amount of $774.00 in 1988, which was applied as a credit against plaintiffs' 1985 tax liability. (Px. 1 at 002.) There was no overpayment attributable to the operation of the Closing Agreements for 1990 or 1991. According to the notices of adjustment prepared by the IRS for those years, the increase in the at risk amount attributable to the net income reported by the partnership did not result in any

overpayment because of the limitations on the deduction of passive activity losses in § 469. (Dx. 9-15.) The limitations on the deduction of passive activity losses in § 469 was not addressed by the Closing Agreements. Therefore, even if the IRS had improperly applied § 469 to 1990 and 1991, any resulting overpayment would not have been attributable to the operation of the Closing Agreements and would not have been covered by paragraph 15 of those agreements.

Plaintiffs' refund claims for 1992 and 1993 were based on carrybacks from plaintiffs 1995 tax year. (Px. 28 at 339, 380.) Plaintiffs' 1995 claim was based on its contention that it was entitled to deduct additional losses because of an additional capital contribution reflected on their 1995 K-1s from the partnerships. (Px. 28, at 467-469.) However, since that capital contribution was not a cash contribution, pursuant to paragraph 7 of the Closing Agreements there was no increase of the plaintiffs' at risk amount. Therefore, there were no additional losses that plaintiffs could deduct in 1995, and there was nothing to carryback to 1992 and 1993. (Px. 28, at 378, 499.) Thus, there were no refunds attributable to the operation of the closing agreement for 1992, 1993 and 1995.

The plaintiffs' refund claims for 1988, 1990, 1991, and 1995 also sought refunds based on additional investment tax credits as a result of increases in the amount at risk with respect to such credits. (Px. 28 at 269, 286, 310, 467.) While partnership net income will increase the at risk amount for the deduction of losses as provided in § 465, the at risk amount for claiming investment tax credits is set forth in § 49. Section 49(a)(2) provides that the at risk amount for investment tax credits will increase only to the extent of any decrease in the amount of non-qualified non-recourse debt related to the asset in question. Plaintiffs never alleged any such decrease, so there is no basis for claiming additional tax credits. This was the basis for the

disallowance of plaintiffs' claims for 1992, 1993, and 1995. (Px. 28 at 378, 499.) In any event, the application of § 49 is not addressed by the Closing Agreement. Therefore, any refund resulting from additional tax credits would not be a refund attributable to the Closing Agreements.

There is nothing in the Closing Agreements that requires the IRS to allow a claim for refund for an overpayment of tax that did not result from the operation of the Closing Agreements. The only year that there was an overpayment of tax as a result of the Closing Agreements was 1988, and that overpayment was applied as a credit against plaintiffs' 1985 tax liability, in accordance with paragraph 15 of the Closing Agreements and § 6402(a). Therefore, even using plaintiffs' incorrect interpretation of the word "offset" in that paragraph, there would be no impact on plaintiffs' tax deficiencies for 1985-1987, and no notice of deficiency was required before those deficiencies could be assessed.

CONCLUSION

Plaintiffs' motion for partial summary judgment should be denied, and defendant's cross-motion for partial summary judgment, requesting a determination that the additional tax assessments for plaintiffs' 1985, 1986, and 1987 were valid and that the IRS was not required to issue a notice of deficiency before assessing those amounts, should be granted.

Respectfully submitted,

s/Benjamin C. King, Jr.

BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief

s/Mary M. Abate

Of Counsel

July 31, 2007