IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1041 T, consolidated with
No. 04-1598 T

(Judge George W. Miller)

---

LYMAN F. BUSH, et al.,

Plaintiffs

v.

UNITED STATES,

Defendant

---

MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT

---

Defendant, the United States, has cross-moved for partial summary judgment. For the reasons set forth below, and based on the defendant's proposed findings of uncontroverted fact and plaintiffs' proposed findings of uncontroverted fact, and the parties' exhibits, the defendant respectfully submits that it is entitled to judgment as a matter of law, dismissing with prejudice plaintiffs' claims set forth in the complaint in case number 02-1041 T.

# I. INTRODUCTION

## A. *Prior proceedings in this case*.

This cross-motion for partial summary judgment addresses plaintiffs' claims for refund for 1988, 1990-1993, and 1995. The original returns for the years in issue were joint returns filed by Lyman F. Bush and Beverly J. Bush. (Dx. 1-5, 10.) Subsequent to the years in issue, Beverly Bush died and, on June 16, 1999, Lyman F. Bush was appointed executor of her estate. Hereinafter, defendant will use the term "Bush" to refer collectively to Lyman F. Bush individually, and in his capacity as executor of the estate of Beverly Bush.

The parties previously filed cross-motions for partial summary judgment related to one of the issues raised by the complaint in case number 04-1598 T. That complaint addressed Bush's claims for refund for tax years 1985-1987, which years are not at issue in complaint number 02-1041, the complaint at issue in this motion. In Bush's first motion for partial summary judgment, he contended that the assessments of additional tax and interest with respect to 1985-1987 were invalid because no notice of deficiency had been issued prior to those assessments. Defendant cross-moved, contending that no notice of deficiency was required and, therefore, the assessments in question were valid. On August 17, 2007, the Court issued an opinion denying Bush's motion, and granting defendant's cross-motion, holding that the assessments were valid. *Lyman F. Bush, et al. v. United States*, 78 Fed. Cl. 76 (2007).

Bush then sought to pursue the other issue raised in the complaint in case number 04-1598 T, whether the assessments were invalid because they were not made within the applicable

statute of limitations.[1] After discovery, Bush conceded in a Motion to Sever filed on March 31, 2008, that the assessments were timely and that all the issues raised in the complaint in case number 04-1598 T are now resolved and judgment can be entered with respect to the claims set forth in that complaint. (Pl. Mtn. to Sever at 5.) In his Motion to Sever, Bush acknowledged that the only issues remaining to be resolved in the above-captioned consolidated cases are the matters set forth in the complaint in case number 02-1041 T. (P. Mtn. to Sever at 1-2.)

B. *Summary of the dispute*.

All the claims at issue in this case relate to adjustments of items reported on Bush's returns for 1988-1993 and 1995, related to three partnerships, Summer Lovers, Lone Wolf McQuade, and Cinema 84. The IRS determined that those partnerships were illegal tax shelters and issued Notices of Final Partnership Administrative Adjustments (hereinafter, "FPAA").[2] The IRS and Bush executed closing agreements to settle the disputes regarding the three partnerships. The closing agreement related to the Summer Lovers partnership was executed on August 18, 1994. (Dx. 6.) However, that agreement related only to Bush's 1982 tax year. (Dx. 6.) The closing agreements related to the Lone Wolf McQuade (hereinafter, "LWM") and Cinema 84 partnerships were executed on August 7, 1999. (Dx. 7, 8.) The agreement for LWM

---

[1]Bush also claimed a refund for each of the years in issue based on an abatement of interest. Bush subsequently acknowledged that he is no longer pursuing that issue in light of the recent Supreme Court decision in *Hinck v. United States*, 127 S.Ct. 2011 (2007). (P. Mtn. to Sever at 1-2.)

[2]While defendant has copies of the Notice of Final Partnership Adjustment (FPAA) issued by the IRS related to the Lone Wolf McQuade and Cinema 84 partnerships, it does not have a copy of any FPAA issued with respect to Summer Lovers partnership.

covered tax years 1983-1995, while the agreement for Cinema 84 covered years 1984-1995. (Dx. 7, 8.) Otherwise, the terms of those two closing agreements were the same. (Dx. 7, 8.)

Each of the three closing agreements specified that the amount Bush was at risk for purposes of 26 U.S.C. § 465 was $50,000.00, and the qualified investment for purposes of the investment tax credit was $50,000.00.[3] (Dx. 6-8.) The closing agreements provided that, pursuant to § 465, the amount Bush was at risk with respect to partnership losses was increased to the extent the partnerships reported income or to the extent Bush made cash contributions to the partnerships. In that event, pursuant to § 465, Bush could deduct losses previously disallowed to the extent of the partnership income or the cash contribution in the subsequent year. There is no provision in the closing agreements regarding increases in the at risk amount with regard to investment tax credits. (Dx. 6-8.)

Bush's claims for refund for 1988, 1990, 1991 and 1993, are based on the contention that he is entitled to deduct previously-disallowed losses and investment tax credits to the extent of the income any of the partnerships reported in each of those years.[4] (Dx. 9-12.) Bush's claims for refund for 1992 and 1995 are based the contention that Bush is entitled to deduct previously-disallowed losses and investment tax credits in 1995, to the extent of the capital contribution reported on the Forms K-1 issued by the LWM and Cinema 84 partnerships in that year. (Dx.

[3]References to the Internal Revenue Code, Title 26, are to the provisions of the Code in effect during the years in issue in this case.

[4]Bush's claims for refund and complaint use the term "suspended losses" to refer to losses disallowed by operation of § 465. However, there is no reference in that section to losses being suspended. That section sets forth the circumstances under which losses disallowed in prior years can be deducted in the current year. Defendant believes the term "previously-disallowed" losses is a more accurate description of the operation of § 465.

13, 14.) The 1992 claim for refund is based solely on a claimed carry-back of losses from 1995. (Dx. 13.)

Defendant contends that Bush is not entitled to claim any previously disallowed *investment tax credits* in any of the years in issue, for three alternative reasons. First, there is no evidence that the IRS disallowed any investment tax credits claimed by Bush in years prior to the years in issue. Therefore, there would be no previously-disallowed credits Bush could claim in the years in issue. Second, the closing agreements contain no provision for any increase in the at risk amount related to investment tax credits. All the provisions in the closing agreement regarding increases in the at risk amount specifically reference § 465, which provision relates only to the deduction of losses. The at risk rules for investment tax credits are set forth in § 46(c)(8) & (9).[5] (Appendix A; Dx. 6-8.) Since the closing agreements make no allowance for any increase in the at risk amount with respect to investment tax credits, and those agreements state that they "finally determine" all items related to the partnerships in the years in issue, those agreements preclude Bush's claims based on additional investment tax credits in the years in issue. (Dx. 7, 8.)

---

[5]In the Economic Recovery Tax Act of 1981, congress amended § 46 to add subsections (c)(8) and (9). (Appendix A.) Those provisions set forth the at risk rules that apply to investment tax credits. Section 465 by its terms only applies to partnership losses, not tax credits. In 1986, Congress enacted § 49, which now sets forth the at risk rules related to tax credits. That provision is effective for property placed in service after December 31, 1985. The property at issue in this case, various movies, would have been placed in service in the first year of the partnership. It appears that the first year of the Summer Lovers partnership was 1982. The first year of the LWM partnership was 1983, and the first year of the Cinema 84 partnership was 1984. (Dx. 6-8.) Since the property in each instance was placed in service prior to 1986, the applicable at risk rules in this case are the provisions of § 46(c)(8) and (9), which were in effect for property placed in service after December 31, 1980, and before January 1, 1986. (Appendix A.)

Finally, partnership income and a capital contribution do not increase the at risk amount for *investment tax credits* unless the capital contribution is used to pay non-recourse debt related to the qualified property. § 46(c)(9)(B)(Appendix A.) Since there is no evidence to suggest that Bush ever made any such payment with respect to the non-recourse partnership debt, Bush is not entitled to claim any previously-disallowed credits in any of the years in issue.

Defendant contends that Bush is not entitled to any refund based on the deduction of previously-disallowed *losses* for three reasons. First, no losses claimed with respect to the Summer Lovers partnership in the years prior to the years in issue were disallowed by the IRS. Therefore, there are no previously-disallowed Summer Lovers losses that can be deducted in the years in issue. Second, the IRS has already allowed Bush to deduct previously-disallowed LWM and Cinema 84 losses, to the extent of the income reported by those partnerships in 1988, 1990, 1991 and 1993. Third, since Bush concedes that the capital contribution reported on the 1995 Forms K-1 issued by LWM and Cinema 84 partnerships was not a *cash* contribution as contemplated by paragraph 7 of the closing agreements related to those partnerships, that capital contribution did not increase the amount Bush was at risk with respect to those partnerships, and, Bush is not entitled to deduct any previously-disallowed losses in 1995, and there, thus, are no losses that can be carried back to 1992. (Mtn. to Sever, n. 1; Dx. 7, 8.)

## II. FACTUAL BACKGROUND

### A. *1988*.

Attached to Bush's original return for 1988 was a Schedule E, "Supplemental Income Schedule." (Dx. 1.) The Schedule E reported a loss for Summer Lovers in the amount of $15.00, a loss for LWM in the amount of $38.00, and income for Cinema 84 in the amount of

$2,338.00. (Dx. 1.) Bush did not claim any investment tax credit for that year. (Dx. 1.) Pursuant to the closing agreements executed with regard to the LWM and Cinema 84 partnerships, on July 12, 2000, the IRS issued a Form 4549, Notice of Adjustment, with respect to Bush's 1988 tax year. (Dx. 15.) The IRS disallowed the $38.00 loss related to LWM and allowed plaintiffs to deduct $2,338.00 in previously-disallowed losses with respect to Cinema 84. There was no adjustment of the loss related to Summer Lovers. (Dx. 15.) Bush was allowed a refund in 1988 in the amount of $774.00. (Dx. 15.)

On November 24, 1999, Bush filed an amended return for 1988 seeking a refund of $1,021.00. (Dx. 9.) This is the claim for refund at issue here. Bush's 1988 claim for refund was filed before the IRS made the adjustments for that year (described above) pursuant to the closing agreements. Bush's 1988 claim asserted that he was entitled to deduct in that year $2,338.00 in previously disallowed Cinema 84 losses, the same deduction that was allowed by the IRS in its subsequent notice of adjustment for 1988. (Dx. 9, 15.) The claim also asserted that Bush was entitled to claim $234.00 in previously-disallowed investment tax credits with respect to Cinema 84. (Dx. 9.) As noted above, the IRS allowed the deduction in 1988 of $2,338.00 in previously-disallowed Cinema 84 losses. (Dx. 15.) The IRS disallowed Bush's claim for additional investment tax credits, on the basis that partnership income did not increase the at risk amount for credits. (Dx. 16.)

B. *1990*.

The IRS did not have a copy of Bush's 1990 original return. Therefore, they used the copy attached to Bush's amended return for that year to make the adjustments required by the closing agreements. (Dx. 17.) Attached to Bush's original return for 1990 was a Schedule E,

"Supplemental Income Schedule." (Dx. 10.) The Schedule E reported in that year a net loss from the partnerships in which Bush had invested, in the amount of $281.00. Attached to the Schedule E was a Statement 3 which itemized the income and loss reported with respect to each partnership. (Dx. 10.) Statement 3 reported income from Summer Lovers in the amount of $12,418,00, a loss for LWM in the amount of $11.00, and a net loss for Cinema 84 in the amount of $626.00. (Dx. 11.) Bush reported income for Cinema 84 in the amount of $1,459.00, which was offset by $4,540.00 in passive losses carried forward from 1989. (Dx. 10.) Bush did not claim any investment tax credit for that year. (Dx. 10.)

Pursuant to the closing agreements executed with regard to the LWM and Cinema 84 partnerships, on July 12, 2000, the IRS notified Bush that the adjustments pursuant to the closing agreements resulted in no change to Bush's 1990 tax liability. (Dx. 18.) The adjustment to the partnership items in 1990 resulted in no change to Bush's tax liability in that year because, beginning in 1989, Bush began reporting the partnerships as "passive activities" as required by § 469. (Dx. 17.)

Pursuant to § 469(a), losses from passive activities can be used only to offset income from passive activities. Any passive activity losses in excess of passive activity income in a year are carried forward and offset against any passive activity income in future years. § 469(b). In 1990, Bush had already offset the Cinema 84 income in that year with $4,540.00 in passive activity losses carried forward from 1989. (Dx. 10.) Therefore, the only effect of allowing Bush to deduct $1,459.00 of previously-disallowed Cinema 84 losses for 1990, is an increase by $1,459.00 to the amount of passive activity loss Bush could carry forward to 1991.

(Dx. 17.) Since there was no change to Bush's 1990 tax liability, no Form 4549 notice of adjustment was issued for that year.

On November 24, 1999, Bush filed an amended return for 1990 seeking a refund of $5,847.00. (Dx. 10.) This is the claim for refund at issue here. This claim was filed before the IRS made any adjustment to Bush's 1990 tax year pursuant to the closing agreements. Bush's 1990 claim asserted that he was entitled to deduct in that year $12,418.00 in previously-disallowed Summer Lovers losses, due to the income reported by that partnership in that year, and $1,459.00 in previously disallowed Cinema 84 losses, due to the income reported by that partnership. (Dx. 10.) The 1990 claim did not seek any refund based on previously disallowed investment tax credits. (Dx. 10.)

As noted above, in making the adjustments pursuant to the closing agreements, the IRS allowed Bush to deduct $1,459.00 in previously-disallowed Cinema 84 losses as a loss in 1990. (Dx. 17.) However, because those losses were passive activity losses, allowing the deduction did not change Bush's 1990 tax liability. Therefore, there was no overpayment as a result of that adjustment. Bush's 1990 claim does not raise any issue with regard to § 469 or the IRS's adjustments to the passive activity loss or income reported on Bush's 1990 return. (Dx. 10.)

The IRS disallowed Bush's claim for a deduction of previously-disallowed Summer Lovers losses, because no losses claimed with respect to that partnership were disallowed in any prior years. (Dx. 17, 19.) The Summer Lovers closing agreement only covered 1982. (Dx. 6.) It appears that the IRS never adjusted Bush's 1982 return to disallow any Summer Lovers losses in that year. (Dx. 17.) For the 1985 tax year Bush deducted $27,810.00 of Summer Lovers losses. (Dx. 20.) The IRS Notice of Adjustment for that year does not reflect any disallowance

of those Summer Lovers losses. (Dx. 21.) As noted above, Bush reported losses for Summer Lovers in 1988 and in 1992, that were also not disallowed. (Dx. 1, 3, 15, 24.) Therefore, Bush was not entitled to a deduction for any previously-disallowed Summer Lovers losses in 1990. (Dx. 19.)

C. *1991*.

Attached to Bush's original return for 1991 was a Schedule E, "Supplemental Income Schedule." (Dx. 2.) The Schedule E reported net partnership income in the amount of $1,082.00. (Dx. 2.) Attached to Schedule E is Statement 5 which provides a breakdown of income and loss for each passive activity. (Dx. 2.) Statement 5 reports income for Summer Lovers in the amount of $14,747.00, a loss for LWM in the amount of $56.00, and income for Cinema 84 in the amount of $1,272.00, which income was offset by a carryover of passive losses in the amount of $2,455.00. (Dx. 2.) Bush did not claim any investment tax credit for that year. (Dx. 2.)

Pursuant to the closing agreements executed with regard to the LWM and Cinema 84 partnerships, on July 12, 2000, the IRS notified Bush that the adjustments pursuant to the closing agreements resulted in no change to Bush's 1991 tax liability. (Dx. 22.) Since there was no change to Bush's 1991 tax liability, no Form 4549 notice of adjustment was issued for that year. The IRS work papers related to Bush's 1991 tax year explain why there was no change to Bush's 1991 tax liability. (Dx. 23.) On his original 1991 return, Bush reported $1,272,00 in income for Cinema 84, which was offset by a passive loss carry over in the amount of $2,455.00. (Dx. 2.) Therefore, allowing Bush to deduct the $1,272.00 of previously-disallowed Cinema 84 losses,

only increased by $1,272.00 the amount of passive activity loss Bush could carry forward to 1992. (Dx. 23.)

On November 24, 1999, Bush filed an amended return for 1991 seeking a refund of $1,976.00. (Dx. 11.) This is the claim for refund at issue here. Bush's 1991 claim for refund was filed before the IRS made the adjustments for that year pursuant to the closing agreements. Bush's 1991 claim asserted that he was entitled to deduct in that year $1,272.00 in previously-disallowed Cinema 84 losses because of the Cinema 84 income reported in that year, and $14,747.00 in previously disallowed Summer Lovers losses because of the income reported by that partnership for 1991. (Dx. 11.) The claim also asserted that Bush was entitled to claim $127.00 in previously-disallowed investment tax credits with respect to Cinema 84. (Dx. 11.)

As noted above, the IRS allowed the deduction of $1,272.00 in previously-disallowed Cinema 84 losses for the 1991 tax year. (Dx. 23.) However, because those losses were passive activity losses, allowing the deduction did not change Bush's 1991 tax liability, so there was no overpayment as a result of that adjustment. Bush's 1991 claim does not raise any issue with regard to § 469 or the IRS's adjustments to the passive activity loss or income reported on Bush's 1991 return. (Dx. 11.)

The IRS disallowed Bush's claim for a deduction of previously-disallowed Summer Lovers losses because no such losses had been disallowed in prior years. (Dx. 23.) The IRS disallowed Bush's claim for additional investment tax credits, on the basis that partnership income did not increase the at risk amount for credits. (Dx. 23.)

D. *1992.*

Attached to Bush's original return for 1992 was a Schedule E, "Supplemental Income Schedule." (Dx. 3.) The Schedule E reported net income from partnership activities in the amount of $2.00. (Dx. 3.) Attached to Schedule E is Statement 15 which provides a breakdown of income and loss for each passive activity. (Dx. 3.) Statement 15 reports a loss for Summer Lovers in the amount of $1,448.00, no income or loss for LWM and no income or loss for Cinema 84. (Dx. 3.) Bush did not claim any investment tax credit in that year. (Dx. 3.) Since there was no income or loss reported with respect to the LWM and Cinema 84 partnerships in 1992, the IRS made no adjustments with respect to those partnerships in that year. The IRS did not disallow the 1992 Summer Lovers loss. (Dx. 24.)

On November 24, 1999, Bush filed an amended return for 1992, seeking a refund of $16,199.00. (Dx. 13.) This is the claim for refund at issue here. Bush's 1992 claim for refund was filed before the IRS made the adjustments to that year pursuant to the closing agreements. Bush's 1992 claim asserts that he was entitled to deduct in that year a net operating loss carry back from 1995 in the amount of $107,206.00 with respect to LWM, and $87,442.00 with respect to Cinema 84. (Dx. 13.) The claim also asserts that Bush is entitled to claim in that year $1,022.00 in investment tax credits previously disallowed as a result of the capital contribution reported on the K-1 issued by LWM in 1995. (Dx. 13.)

Bush's 1992 refund claim is based solely on the contention that the additional $87,442.00 capital contribution reported on the Cinema 84 K-1 for that year, and the additional $107,206.00 capital contribution reported on the LWM K-1 for that year, increased his at risk amount to that extent, allowing him to deduct previously-disallowed losses pursuant to § 465. (Dx. 13.) The IRS disallowed Bush's claim because there was no evidence the capital contributions reported on

the partnership's 1995 K-1's were *cash* contributions, and, pursuant to the closing agreements only *cash* contributions would increase the at risk amount, allowing the deduction of previously-disallowed losses. (Dx. 7, 8, 25.) Bush has now conceded that the 1995 capital contributions in question were not cash contributions. (P. Mtn. to Sever, n. 1.)

E. *1993*.

Attached to Bush's original return for 1993 was a Schedule E, "Supplemental Income Schedule." (Dx. 4). The Schedule E reports net passive activity income in the amount of $6.00. (Dx. 4.) Attached to Schedule E is Statement 18 which provides a breakdown of income and loss for each passive activity. (Dx. 4.) Statement 18 reports income for Summer Lovers in the amount of $3,284.00, which was offset by a passive loss carryover in the amount of $1,413.00, income for LWM in the amount of $5,626.00, which income was offset by a passive loss carryover in the amount of $75.00, and income for Cinema 84 in the amount of $4,389.00, which income was offset by a carryover of passive losses in the amount of $892.00. (Dx. 4.) Bush did not claim any investment tax credit in that year. (Dx. 4.)

Pursuant to the closing agreements executed with regard to the LWM and Cinema 84 partnerships, on July 12, 2000, the IRS notified Bush that the adjustments pursuant to the closing agreements resulted in no change to Bush's 1993 tax liability. (Dx. 26.) Since there was no change to Bush's 1993 tax liability, no Form 4549 notice of adjustment was issued for that year. The IRS work papers related to Bush's 1993 tax year explain why there was no change to Bush's 1993 tax liability. (Dx. 27.) On his original 1993 return, Bush reported passive activity income of only $6.00. (Dx. 4.) Therefore, the passive activity income reported in that year had already been almost totally offset by passive activity losses reported on the original return. (Dx. 4.)

Allowing Bush to deduct in 1993, $5,626.00 of the previously-disallowed LWM losses and $4,389.00 of the previously-disallowed Cinema 84 losses, only increased by $4,389.00 the amount of passive activity loss Bush could carry forward to 1994. (Dx. 27.)

On November 24, 1999, Bush filed an amended return for 1993, seeking a refund of $11,099,00. (Dx. 12.) This is the claim for refund at issue here. Bush's 1993 claim for refund was filed before the IRS made the adjustments to that year pursuant to the closing agreements. Bush's 1993 claim asserted that he was entitled to deduct in that year $5,626.00 in previously-disallowed LWM losses because of partnership income reported in that year, $4,389.00 in previously-disallowed Cinema 84 losses, and $3,284.00 in previously-disallowed Summer Lovers losses. (Dx. 12.) The claim also asserted that Bush was entitled to claim $563.00 in previously- disallowed investment tax credits with respect to LWM, $310.00 in previously-disallowed Cinema 84 credits, and $328.00 in previously-disallowed Summer Lovers investment tax credits. (Dx. 12.)

As noted above, the IRS allowed the deductions of the previously-disallowed LWM and Cinema 84 losses to the extent of partnership income in 1993. (Dx. 27.) However, because those losses were passive activity losses, allowing those deductions did not change Bush's 1993 tax liability, so there was no overpayment as a result of that adjustment. Bush's 1993 claim does not raise any issue with regard to § 469 or the IRS's adjustments to the passive activity loss or income reported on Bush's 1993 return. (Dx. 12.) The IRS disallowed Bush's claim for a deduction of previously-disallowed Summer Lovers losses, because no losses claimed with respect to that partnership were disallowed in any prior years. (Dx. 27.) The IRS disallowed

Bush's claim for additional investment tax credits, on the basis that partnership income did not increase the at risk amount for credits. (Dx. 25, 27.)

F. *1995.*

Attached to Bush's original return for 1995 was a Schedule E, "Supplemental Income Schedule." (Dx. 5.) The Schedule E reported a net partnership loss in the amount of $1,409.00. (Dx. 5.) Attached to Schedule E is Statement 16 which sets forth the separate items of passive activity income and loss for 1995. (Dx. 5.) Statement 16 reports income for Summer Lovers in the amount of $9,262.00, income for LWM in the amount of $10,219.00, and a loss for Cinema 84 in the amount of $1,416.00. (Dx. 5.) Bush did not claim any investment tax credit in that year. (Dx. 5.) Attached to his return were forms K-1 for the LWM and Cinema 84 partnerships, which indicate that 1995 was the final year of those partnerships. (Dx. 28, 29.) The 1995 K-1 for LWM reported a capital contribution in the amount of $96,987.00. (Dx. 28.) The 1995 K-1 for Cinema 84 reported a capital contribution in the amount of $87,442.00. (Dx. 29.) In the Motion to Sever, Bush conceded that he could not prove that those capital contributions were *cash* contributions. (P. Mtn. to Sever n. 1.)

Pursuant to the Closing agreements executed with regard to the LWM and Cinema 84 partnerships, on July 12, 2000, the IRS issued a Notice of Adjustment for Bush's 1995 tax year which indicated that Bush owed an additional $406.00 in tax for that year. (Dx. 30.) The additional tax liability was based on the disallowance of the $1,430.00 deduction for Cinema 84 losses reported on the return for that year. (Dx. 30.) The IRS work papers show that because of the passive loss rules in § 469, the allowance of the previously-disallowed LWM losses would

not affect Bush's 1995 income tax liability since Bush had already claimed all the passive losses he was entitled to in that year. (Dx. 30.)

On November 24, 1999, Bush filed an amended return for 1995, seeking a refund of $9,413.00. (Dx. 14.) This is the claim for refund at issue here. Bush's 1995 claim for refund was filed before the IRS made the adjustments for that year pursuant to the closing agreements. Bush's 1995 claim asserted that he was entitled to deduct in that year $57,848.00 in previously-disallowed Cinema 84 losses because of the additional capital contribution reported on the 1995 K-1 for that partnership. (Dx. 14.) Bush's 1995 claim also asserted he was entitled to deduct in that year $93,049.00 in previously-disallowed LWM losses, and $1,022.00 in previously-disallowed investment tax credits related to that partnership, because of the capital contribution reported on the 1995 K-1 for that partnership. (Dx. 14.) That claim did not seek any refund based on the deduction of previously-disallowed partnership losses to the extent of partnership income in that year.

The IRS disallowed Bush's 1995 claim for refund because paragraph 7 of the Cinema 84 and LWM closing agreements specify that only a *cash* contribution to the partnerships would increase Bush's at risk amount. (Dx. 25.) Since Bush admits he cannot establish that the contribution reported on the 1995 K-1s were cash contributions, that contribution does not increase the at risk amount and does not allow Bush to deduct any previously-disallowed losses. (P. Mtn. to Sever, n. 1; Dx. 25.)

The IRS disallowed Bush's 1995 claim based on additional investment tax credits because a capital contribution does not increase the at risk amount for investment tax credits, unless the contribution is used to pay the principal on non-recourse partnership debt, a fact not

alleged in the claim. (Dx. 25.) There is no evidence that the capital contribution in question was used to pay the principal of partnership non-recourse debt. Therefore, Bush is not entitled to claim any additional investment tax credits in 1995.

## II. LEGAL ARGUMENT

### A. *Bush is not entitled to deduct any previously disallowed Summer Lovers losses in any of the years in issue.*

Bush has claimed refunds for 1990, 1991, and 1993 based on the deduction of Summer Lovers losses that had been disallowed in prior years based on the application of the at risk rules in Code § 465. (Dx. 10, 11, 12.) Bush asserts that he is entitled to deduct losses previously disallowed, pursuant to § 465, to the extent of the income reported by Summer Lovers in those years. (Dx. 10, 11, 12.) Bush is not entitled to those refunds because he has not established that any Summer Lovers losses reported for tax years prior to 1990, were disallowed by the IRS. This was the basis for the IRS disallowance of Bush's claims related to this issue. (Dx. 17, 19.)

The notices of adjustment for Bush's 1983, 1984, and 1985 tax years confirm that none of the Summer Lovers losses claimed for those years were disallowed. (Dx. 31, 32, 21.) Also, as set forth above, the IRS did not disallow the Summer Lovers losses Bush claimed in 1988 and 1992. (Dx. 15, 24.) Since there were no previously-disallowed Summer Lovers losses, partnership income in 1990, 1991, and 1993 did not permit deduction of any Summer Lovers losses in those years. Bush is not entitled to any refund based on this issue.

### B. *Bush is not entitled to claim any additional investment tax credits.*

Bush has claimed refunds in 1988, 1991, 1992, 1993, and 1995, based on previously-disallowed investment tax credits he claims to be able to use, to the extent of the partnership income reported in those years. (Dx. 9, 11-14.) For 1988, 1991, and 1993, Bush asserts that his

at risk amount for purposes of the investment tax credit was increased to the extent of the partnership income in those years. (Dx. 9, 11, 12.) For 1992 and 1995, Bush asserts that his at risk amount for purposes of the investment tax credit was increased to the extent of the capital contribution reported on the 1995 Forms K-1 for LWM and Cinema 84. (Dx. 13, 14.) Defendant submits that Bush is not entitled to any of those claimed refunds for three alternative reasons.

First, the LWM and Cinema 84 closing agreements preclude any additional investment tax credits in the years in issue. The preamble of the closing agreements states that "the parties wish to determine, with finality, the taxpayers' income, gains, losses, deductions and credits" for the years in issue. (Dx. 7. 8.) The provisions of the closing agreement that reference an increase to the amount Bush is at risk with regard to the partnerships are paragraphs 6-9. All those paragraphs specifically reference only increases in the at risk amount "pursuant to § 465." (Dx. 7, 8.) Section 465 only relates to partnership *losses*. Increases in the at risk amount for *investment tax credits* are governed by § 46(c)(9). Since there is no reference in the closing agreement to an increase in the amount Bush was at risk with regard to investment tax credits, those agreements preclude any claim for refund based on any such increase.

Second, it is clear that the IRS did not disallow any investment tax credits related to the three partnerships in issue. While the Summer Lovers closing agreement indicates that Bush could only claim $5,000 in investment tax credit in 1982, there is no evidence the IRS ever adjusted any items reported on Bush's 1982 original return in accordance with that agreement. In fact, the information from the IRS indicates that no such adjustment was made. (Dx. 17, 19.)

With respect to the LWM and Cinema 84 partnerships, it appears that Bush did not claim any investment tax credits in 1983, the first year of the LWM partnership, or in 1984, the first year of the Cinema 84 partnership. The notices of adjustment for those years do not show the disallowance of any investment tax credits. (Dx. 31, 32.) The notice of adjustment for Bush's 1981 year states that Bush did not claim any investment credits with respect to the LWM and Cinema 84 partnerships in 1983 or 1984. (Dx. 33.) To the extent Bush cannot prove that the IRS disallowed investment tax credits he claimed on his 1982, 1983, and 1984 returns, there are no previously-disallowed credits to be claimed in 1988, 1991-1993, and 1995. Bush is not entitled to any refund based on those claims.

Finally, even if Bush could prove that there were investment tax credits disallowed by application of the at risk rules in § 46(c), he would not be entitled to any refund because neither the partnership income in 1988, 1991-1993, nor the capital contributions reported in 1995, increases the amount he was at risk with respect to investment tax credits. Section 46(c)(9)(B) sets forth the circumstances under which a taxpayer's at risk amount can be increased.

> (B) **INCREASES TO BE TAKEN INTO ACCOUNT.–** For purposes of subparagraphs (A) and (C), the amount which a taxpayer has at risk with respect to the property shall be treated as increased by the sum of cash and the fair market value of property (other than property with respect to which the taxpayer is not at risk) used during the taxable year to reduce the principal sum of any amount with respect to which the taxpayer is not at risk.

The legislative history related to the enactment of § 46(c) makes it clear that partnership income and capital contributions, unless those contributions are used to pay the principal on the partnership's non-recourse debt, will not increase the amount a taxpayer is at risk with respect to investment tax credits. House Report No. 97-201, Economic Recovery Tax of 1981, reprinted in

1981-2 C.B. 352, 435, states in this regard (emphasis added):

> A taxpayer's amount at risk with respect to property is increased only through increases in the actual investment in the property, such as by repayment of nonrcourse debt for the property. Repayment must be made with amounts for which the taxpayer is at risk within the meaning of section 465. Repayments of debt from a qualified lender, which is considered to be at risk, will not increase the taxpayer's amount at risk with respect to property. Unless operating profits of a business are used to repay debt with respect to section 38 property, such amounts would not increase at risk amounts for these purposes, *even if there would be increases in amounts at risk with respect to section 465*.

It is clear that Congress intended that the at risk rules in § 465, for *losses*, do not apply to the investment tax credit. Therefore, Bush's claims for a refund based on an increase in the amount he was at risk are without merit and he is not entitled to any refund based on those claims.

C. *Bush is not entitled to any refund based on the deduction of suspended LWM or Cinema 84 losses in years in which the partnerships reported income.*

Bush claims refunds for 1988, 1990, 1991, and 1993, based on the deduction of LWM and Cinema 84 losses disallowed in prior years to the extent of the income reported by the partnerships in those years. Bush is not entitled to any refund based on this issue because the IRS has already allowed the deductions Bush claims. Bush filed his claims for refund before the IRS made any adjustments to the tax years in issue pursuant to the closing agreements. When the IRS made those adjustments on July 12, 2000, they allowed in tax years 1988, 1990, 1991, and 1993, deductions of previously disallowed LWM and Cinema 84 losses to the extent of the income reported by those partnerships in those years. (Dx. 15, 17, 23, 21.)

Bush received the refund sought for 1988. The only reason Bush did not receive refunds in 1990, 1991, or 1993, resulted from the fact that, beginning in 1989, Bush began reporting the partnerships as passive activities, so the limitations in Code § 469 applied to those years.

Pursuant to § 469, the losses generated by the partnerships in 1990, 1991, and 1993 were passive activity losses that could only be used to offset passive activity income. Since Bush reported on his original return more passive activity losses than passive activity income in each of those years, the IRS allowance of the previously disallowed LWM and Cinema 84 losses in each of those years only increased the amount of passive activity losses Bush was required to carry forward to future tax years. Since those losses were passive activity losses they could not be used to offset the other income reported on the returns for those years, so there was no change in Bush's tax liability for 1990, 1991, or 1993. (Dx. 18, 22, 26.) Therefore, Bush is not entitled to any refund based on this issue.

D. *Bush is not entitled to any refund based on the 1995 capital contributions*.

1. *The relevant closing agreement provisions*.

The issues of whether the 1995 capital contributions related to the LWM and Cinema 84 partnerships increased the amount Bush was at risk with respect to those partnerships is governed by the provisions of the closing agreements executed by the IRS and Bush with respect to those partnerships.[6] The relevant provisions of the closing agreements for the LWM and Cinema 84 partnerships are the same. (Dx. 7, 8.)

Paragraph 1 of the closing agreements provides that there will be no adjustment to the partnerships' income, losses, or credits in the years covered by the agreements. Paragraph 2 provides that Bush could claim on his tax returns for the years covered by the agreements distributive losses and credits from the partnerships only "to the extent they are at risk under

[6]This issue does not apply to Summer Lovers, because no K-1 was attached to Bush's 1995 return indicating any additional capital contribution with respect to that partnership in that year. (Dx. 5.)

I.R.C. § 465." (Dx. 7, 8.) Paragraph 3 of the closing agreements specifies that Bush is at risk only to the extent of his capital contribution to the partnerships. (Dx. 7. 8.) Paragraph 4 provides that, for each of the partnerships, Bush's capital contribution was $50,000.00. (Dx. 7, 8.) Paragraph 5 provides that Bush's qualified investment with respect to each partnership, for purposes of computing any investment tax credit, is $50,000. (Dx. 7, 8.)

Paragraph 6 of the closing agreements provides that any *losses* disallowed by application of the at risk provisions in § 465, are suspended pursuant to that provision, and can be used to offset any income reported by the partnership in a subsequent year, in accordance with the operation of § 465. Paragraph 7 of the closing agreements provides that to the extent Bush makes additional cash contributions to the capital of the partnership his at risk amount will be increased, pursuant to § 465. Paragraph 8 provides that the at-risk amount with respect to partnership losses is increased by any income reported by the partnership, pursuant to § 465. Paragraph 9 provides that cash payments on the principal of any partnership notes will also increase the at risk amount with respect to partnership losses, pursuant to § 465. (Dx. 7, 8.)

2. *The 1992 and 1995 claims for refund.*

The last year of the LWM and Cinema 84 partnerships was 1995. (Dx. 28, 29.) At that time Bush had a negative capital account with respect to each partnership. (Dx. 28, 29.) On the Form K-1s issued by those partnerships for 1995, there is reported a capital contribution equal to the amount of the negative capital account. (Dx. 28, 29.) It is likely that the capital contribution was merely a bookkeeping entry to balance out the capital account in order to close the partnerships' books. In any event, Bush has conceded that the capital contribution was not a cash contribution. (P. Mtn. to Sever, n. 1.)

Paragraph 7 of the closing agreements for LWM and Cinema 84 states that Bush's amount at risk with respect to partnership losses is increased only to the extent of cash contributions made to the partnership. Since the capital contributions noted on the 1995 Forms K-1 for the partnerships were not cash contributions, they do not increase the amount Bush was at risk with respect to the partnerships. Therefore, Bush is not entitled to claim any LWM or Cinema 84 suspended losses in 1995, and, as a result, there is nothing to carry back to 1992. Since that is the only ground set forth in Bush's 1992 and 1995 claims for refund, Bush is not entitled to any refund for those years.

E. *Paragraph 15 of the closing agreements does not entitle Bush to any refunds*.

In his claims for refund at issue in this case, Bush asserts that the IRS was obligated by paragraph 15 of the LWM and Cinema 84 closing agreement to grant its claims. (Dx. 10-14.) There is no similar provision in the Summer Lovers closing agreement. (Dx. 6.) Paragraph 15 of both the LWM and Cinema 84 closing agreements provides that "any refund claim attributable to the operation of this agreement" will be allowed if filed within one year of the execution of the agreements, and that, if any such claims are filed within 120 days of the execution of the agreements, they will be allowed as offsets against any deficiencies resulting from the agreements. (Dx. 7, 8.) Paragraph 15 by its express terms relates only to "refund claims attributable to the operation of the closing agreement." (Dx. 7, 8.)

Since there is no similar provision in the Summer Lovers closing agreement, any claim based on items related to that partnership cannot be "a refund claim attributable to the operation of" the LWM and Cinema 84 closing agreements. Therefore, paragraph 15 of those closing agreements cannot entitle Bush to any refund related to the Summer Lovers partnership.

There is nothing in the LWM and Cinema 84 closing agreements regarding increases to the amount Bush was at risk for purposes of the *investment tax credit*. The provisions of those agreements regarding increases to amounts at risk specifically reference only § 465, which pertains only to partnership *losses*. (Dx. 7, 8.) There is also no reference in either the LWM or Cinema 84 closing agreements to § 46(c), the code section that governs increases in the at risk amount for purposes of investment tax credits. Therefore, Bush's claims for refund based on additional investment tax credits in the years in issue cannot be "attributable to the operation of the" closing agreements, and paragraph 15 of those agreements does not entitle Bush to any refund related to investment tax credits.

Finally, paragraph of the LWM and Cinema 84 closing agreements specifies that only a cash contribution to the partnership will increase the amount Bush was at risk pursuant to § 465. Bush concedes that the contributions reported on the Forms K-1 issued by LWM and Cinema 84 in 1995 were not cash contributions. (P. Mtn. to Sever, n. 1.) Bush's claim for refund based on the 1995 capital contributions are not "attributable to the operation of the" closing agreements, since those contributions are outside the express provisions of paragraph 8 of those agreements. Therefore, paragraph 15 of the closing agreements does not relate to Bush's 1992 and 1995 claims for refund.

The only claims for refund filed by Bush for the years in issue that are "attributable to the operation of the" closing agreements, and covered by paragraph 15, were the claims for refund for 1988, 1990, 1991, and 1993, based on the deduction of previously-disallowed LWM and Cinema 84 losses to the extent of income reported by the partnerships in those years. In accordance with paragraph 15, the IRS allowed the additional deductions claimed by Bush in

each of those years. Bush received the refund he was entitled to for 1988. The only reason Bush did not receive refunds in 1990, 1991, and 1993, was the limitation on the deduction of passive activity losses mandated by § 469. The LWM and Cinema 84 closing agreements do not refer to § 469. Therefore, any claim for refund contesting the application of that section in the years in issue would not be a claim attributable to the closing agreements and paragraph 15 would not apply. In any event, Bush never filed any such claim, and, therefore, is not entitled to any refund based on the passive activity losses the IRS allowed in 1990, 1991, and 1993.

## CONCLUSION

For the reasons set forth above, defendant, the United States, respectfully moves this Court for judgment in its favor granting defendant's motion for partial summary judgment, and denying plaintiff's motion for partial summary judgement, and dismissing the complaints in

the above-captioned consolidated cases with prejudice.

Respectfully submitted,

s/Benjamin C. King, Jr.

BENJAMIN C. KING, JR.
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

NATHAN J. HOCHMAN
Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
MARY M. ABATE
Assistant Chief

s/Mary M. Abate
Of Counsel

June 13, 2008

***No. 02-1041 T Consolidated No. 04-1598 T***
***(Judge George W. Miller)***

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

LYMAN F. BUSH, et al.,

Plaintiffs

v.

THE UNITED STATES,

Defendant

MEMORANDUM IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

NATHAN J. HOCHMAN
Assistant Attorney General

DAVID GUSTAFSON
MARY M. ABATE
BENJAMIN C. KING, JR.
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

Page

## TABLE OF CONTENTS


Memorandum in Support of Defendant's Cross-Motion for Partial Summary Judgment . . . . . . 1

I. Introduction . . . . . . 2

A. *Prior proceedings in this case* . . . . . . 2

B. *Summary of the dispute* . . . . . . 3

II. Factual Background . . . . . . 6

A. *1988* . . . . . . 6

B. *1990* . . . . . . 7

C. *1991* . . . . . . 10

D. *1992* . . . . . . 11

E. *1993* . . . . . . 13

F. *1995* . . . . . . 15

III. Legal Argument . . . . . . 17

A. *Bush is not entitled to deduct any previously disallowed Summer Lovers losses in any of the years in issue* . . . . . . 17

B. *Bush is not entitled to claim any additional investment tax credits* . . . . 17

C. *Bush is not entitled to any refund based on the deduction of suspended LWM or Cinema 84 losses in years in which the partnerships reported income* . . . . . . 20

D. *Bush is not entitled to any refund based on the 1995 capital contributions* . . . . . . 21

1. *The relevant closing agreement provisions* . . . . . . 21

2. *The 1992 and 1995 claims for refund* . . . . . . 22

**Page**

**(Continuation):**

E. *Paragraph 15 of the closing agreements do not entitle Bush to any refunds* . . . . . . . . . . 23

Conclusion . . . . . . . . . . 25

Appendix A:

Economic Recovery Tax Act of 1981, § 46, Pl. L 97-34, USCCAN, 1981-1 . . . . . . . A-1

Internal Code of 1986 (26 U.S.C.)

§ 465 . . . . . . . . . . A9

§ 469 . . . . . . . . . . A25

Attachments:

| Exhibit | Description |
|---|---|
| 1. | Plaintiffs Individual Income Tax Return for the Year 1988. |
| 2. | Plaintiffs Individual Income Tax Return for the Year 1991. |
| 3. | Plaintiffs Individual Income Tax Return for the Year 1992. |
| 4. | Plaintiffs Individual Income Tax Return for the Year 1993. |
| 5. | Plaintiffs Individual Income Tax Return for the Year 1995. |
| 6. | Closing Agreement Related to the Summer Lovers Partnership. |
| 7. | Closing agreements related to the Lone Wolf McQuade (hereinafter, "LWM") and Cinema 84 partnerships. |
| 8. | Closing Agreements Related to Cinema 84 Partnerships. |
| 9. | Plaintiffs Amended Individual Income Tax Return for the Year 1988. |
| 10 | Plaintiffs Amended Individual Income Tax Return for the Year 1990. |

**Page**

**(Continuation):**

11. Plaintiffs Amended Individual Income Tax Return for the Year 1991.

12. Plaintiffs' Amended Individual Income Tax Return for the Year 1993.

13. Plaintiffs Amended Individual Income Tax Return for the Year 1992.

14. Plaintiffs Amended Individual Income Tax Return for the Year 1995.

15. Form 4549, Notice of Adjustment, with Respect to Bush's 1988 Tax Year.

16. IRS Letter Dated February 28, 2001, Disallowing Bush's Claim for Additional Investment Tax Credits, on the Basis That Partnership Income.

17. IRS Examination Work Papers Adjustments Required by the Closing Agreements.

18. IRS Letter Dated July 12, 200, Notifying Bush's That the Adjustments Pursuant to the Closing Agreements Resulted in No Change to Bush's 1990 Tax Liability.

19. IRS Letter Dated August 23, 200, Notifying the Bush They Were Not Entitled a Deduction for Any Previously-disallowed Summer Lovers Losses in 1990.

20. Plaintiffs Individual Income Tax Return for the Year 1985.

21. IRS Form 4549, Income Examination Change The Tax Period Ending December 31, 1985.

22. IRS Letter Dated July 12 ,2000, Notifying Bush's That the Adjustments Pursuant to the Closing Agreements Resulted in No Change to Bush's 1991 Tax Liability.

23. IRS Work Papers Relating to Bush's 1991 Tax Year.

24. IRS Letter Dated July 12, 2000, Notifying Bush's of the Disallowance of The 1992 Summer Lovers Loss.

25. IRS Letter Dated August 23, 2000, Disallowing Bush's Claim For The Tax Periods Ending December 31, 1992 - December 31, 1993.

**Page**

**(Continuation):**

26. IRS Letter Dated July 2000, Notifying Bush's of the Disallowance of There Claim With Respect to Lone Wolf McQuade Associates and Cinema 84 Partnerships.

27. IRS Work Papers Relating to Bush's 1993 Tax Year.

28. Plaintiffs' IRS Form 1065, Schedule K-1, Partner's Share of Income, Credit, Deduction (Lone Wolf McQuade Associates).

29. Plaintiffs' IRS Form 1065, Schedule K-1, Partner's Share of Income, Credit, Deduction (Cinema 84).

30. IRS Form 4549A, Income Tax Examination of Changes for The Tax Period Ending December 31, 1995.

31. IRS Form 4549A, Income Tax Examination of Changes for The Tax Period Ending December 31, 1983.

32. IRS Form 4549A, Income Tax Examination of Changes for The Tax Period Ending December 31, 1984.

33. IRS Form 4549A, Income Tax Examination of Changes for The Tax Period Ending December 31, 1981.

**Page**

**TABLE OF AUTHORITIES**

**Cases:**

*Hinck v. United States*, 127 S. Ct. 2011 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lyman F. Bush, et al. v. United States*, 78 Fed. Cl. 76 (2007) . . . . . . . . . . . . . . . . . . . . . 2

**Statutes:**

Economic Recovery Tax Act of 1981, § 46, Pl. L 97-34, USCCAN, 1981-1 . . . . . . 18, 19

Internal Revenue Codes of 1986 (26 U.S.C.):

§ 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

§ 469 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 20, 24

H.R. No. 97-201, Economic Recovery Tax of 1981,
*Reprinted in* 1981-2 C.B. 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*No. 02-1041 T Consolidated No. 04-1598 T*
*(Judge George W. Miller)*

## *IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

LYMAN F. BUSH, et al.,

Plaintiffs

v.

THE UNITED STATES,

Defendant

# APPENDIX A TO MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

NATHAN J. HOCHMAN
Assistant Attorney General

DAVID GUSTAFSON
MARY M. ABATE
BENJAMIN C. KING, JR.
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

Page

# TABLE OF CONTENTS

Appendix A:

Economic Recovery Tax Act of 1981, § 46, Pub. L. No. 97-34, 95 Stat. 172 ....... A-1

Internal Code of 1986 (26 U.S.C.)

§ 465 .................................................... A9

§ 469 .................................................... A25

97-34 [H.R. 4242]; August 13, 1981

# ECONOMIC RECOVERY TAX ACT OF 1981

*For Legislative History of Act, see p. 105*

An Act to amend the Internal Revenue Code of 1954 to encourage economic growth through reduction of the tax rates for individual taxpayers, acceleration of capital cost recovery of investment in plant, equipment, and real property, and incentives for savings, and for other purposes.

Economic Recovery Tax Act of 1981. 26 USC 1 note.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS; AMENDMENT OF 1954 CODE.**

(a) Short Title.—This Act may be cited as the "Economic Recovery Tax Act of 1981".

(f) APPLICATION OF AT RISK RULES TO INVESTMENT CREDIT.— 26 USC 46.

(1) IN GENERAL.—Subsection (c) of section 46 (relating to qualified investment) is amended by adding at the end thereof the following new paragraphs:

"(8) LIMITATION TO AMOUNT AT RISK.—

"(A) IN GENERAL.—In the case of new or used section 38 property which—

"(i) is placed in service during the taxable year by a taxpayer described in section 465(a)(1), and

"(ii) is used in connection with an activity with respect to which any loss is subject to limitation under section 465,

the basis of such property for purposes of paragraph (1) shall not exceed the amount the taxpayer is at risk with respect to such property as of the close of such taxable year.

"(B) AMOUNT AT RISK.—

"(i) IN GENERAL.—Except as provided in clause (ii), the term 'at risk' has the same meaning given such term by section 465(b) (without regard to paragraph (5) thereof).

"(ii) CERTAIN FINANCING.—In the case of a taxpayer who at all times is at risk (determined without regard to this clause) in an amount equal to at least 20 percent of the basis (determined under section 168(d)(1)(A)(i)) of property described in subparagraph (A) and who acquired such property from a person who is not a related person, such taxpayer shall for purposes of this paragraph be considered at risk with respect to any amount borrowed in connection with such property (other than convertible debt) to the extent that such amount—

"(I) is borrowed from a qualified person, or

"(II) represents a loan from any Federal, State, or local government or instrumentality thereof, or is guaranteed by, any Federal, State, or local government.

"(C) SPECIAL RULE FOR PARTNERSHIPS AND SUBCHAPTER S CORPORATIONS.—In the case of any partnership or electing small business corporation (within the meaning of section 1371(b)), any amount treated as at risk under subparagraph (B)(ii) shall be allocated among the partners or shareholders (and treated as an amount at risk with respect to such persons) in the same manner as the credit allowable by section 38.

"(D) QUALIFIED PERSON.—For purposes of this paragraph, the term 'qualified person' means any person—

"(i) which—

"(I) is an institution described in clause (i), (ii), or (iii) of subparagraph (A) or subparagraph (B) of section 128(c)(2) or an insurance company to which subchapter L applies, or

Post, pp. 267, 270.

26 USC 401.

"(II) is a pension trust qualified under section 401(a) or a person not described in subclause (I) and which is actively and regularly engaged in the business of lending money,

"(ii) which is not a related person with respect to the taxpayer,

"(iii) which is not a person who receives a fee with respect to the taxpayer's investment in property described in subparagraph (A) or a related person to such person, and

"(iv) which is not a person from which the taxpayer acquired the property described in subparagraph (A) or a related person to such person.

Ante, p. 203.

"(E) RELATED PERSON.—For purposes of this paragraph, the term 'related person' has the same meaning as such term is used in section 168(e)(4), except that in applying section 168(e)(4)(D)(i) in the case of a person described in subparagraph (D)(i)(II) of this paragraph, sections 267(b) and 707(b)(1) shall be applied by substituting '0 percent' for '50 percent'.

"(F) SPECIAL RULE FOR CERTAIN ENERGY PROPERTY.—

"(i) IN GENERAL.—The provisions of subparagraph (A) shall not apply to amounts borrowed with respect to qualified energy property (other than amounts described in subparagraph (B)).

"(ii) QUALIFIED ENERGY PROPERTY.—The term 'qualified energy property' means energy property to which (but for this subparagraph) subparagraph (A) applies and—

"(I) which is described in clause (iii),

"(II) with respect to which the energy percentage determined under section 46(a)(2)(C) at the time such property is placed in service is greater than zero,

"(III) with respect to which the taxpayer, as of the close of the taxable year in which the property is placed in service, is at risk (within the meaning of section 465(b) without regard to paragraph (5) thereof) in an amount equal to at least 25 percent of the basis of the property, and

"(IV) with respect to which any nonrecourse financing (other than financing described in section 46(c)(8)(B)(ii)) in connection with such property consists of a level payment loan.

For purposes of subclause (II), the energy percentage for property described in clause (iii)(V) shall be treated as being greater than zero during any period the energy percentage for property described in section 48(l)(14) is greater than zero.

"(iii) PROPERTY TO WHICH THIS SUBPARAGRAPH APPLIES.—Energy property is described in this clause if such property is—

"(I) described in clause (ii), (iv), or (vii) or section 48(l)(2),

"(II) described in section 48(l)(15),

"(III) described in section 48(l)(3)(A)(iii) (but only to the extent such property is used for converting an alternate substance into alcohol for fuel purposes),

"(IV) described in clause (i) of section 48(l)(2)(A) (but only to the extent such property is also described in section 48(l)(3)(A) (viii) or (ix)), or

"(V) property comprising a system for using the same energy source for the sequential generation of electrical power, mechanical shaft power, or both, in combination with steam, heat, or other forms of useful energy.

"(iv) LEVEL PAYMENT LOAN DEFINED.—The term 'level payment loan' means a loan in which each installment is substantially equal, a portion of each installment is attributable to the repayment of principal, and that portion is increased commensurate with decreases in the portion of the payment attributable to interest.

"(9) SUBSEQUENT INCREASES IN THE TAXPAYER'S AMOUNT AT RISK WITH RESPECT TO THE PROPERTY.—

"(A) IN GENERAL.—If, at the close of a taxable year subsequent to the year in which property was placed in service, the amount which the taxpayer has at risk with respect to such property has increased (as determined under subparagraph (B)), such increase shall be taken into account as additional qualified investment in such property in accordance with subparagraph (C).

"(B) INCREASES TO BE TAKEN INTO ACCOUNT.—For purposes of subparagraphs (A) and (C), the amount which a taxpayer has at risk with respect to the property shall be treated as increased by the sum of the cash and the fair market value of property (other than property with respect to which the taxpayer is not at risk) used during the taxable year to reduce the principal sum of any amount with respect to which the taxpayer is not at risk.

"(C) MANNER IN WHICH TAKEN INTO ACCOUNT.—For purposes of determining the amount of credit allowed under section 38 and the amount of credit subject to the early disposition rules under section 47, an increase in a taxpayer's qualified investment in property (determined under subparagraph (B)) shall be deemed to be additional qualified investment made by the taxpayer in the year in which the property referred to in subparagraph (A) was first placed in service. However, the credit determined by taking into account the increase in qualified investment under this paragraph shall be considered a credit earned in the taxable year of such increase."

(2) RECAPTURE.—Section 47 (relating to certain dispositions of section 38 property), is amended by adding at the end thereof the following new subsection: 26 USC 47.

"(d) PROPERTY CEASING TO BE AT RISK.—

"(1) IN GENERAL.—If the taxpayer ceases to any extent to be at risk (within the meaning of section 46(c)(8)(B)) with respect to any amount in connection with section 38 property, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in credits allowed under section 38 for all prior taxable years which would have resulted from substituting, in determining qualified investment, the amount determined under section 46(c)(8) with respect to such

property if, on the date the property was placed in service, the taxpayer had not been at risk with respect to the amount he ceased to be at risk to.

"(2) CERTAIN TRANSFERS NOT TREATED AS CEASING TO BE AT RISK.—If, after the 12-month period after the date on which a taxpayer borrows an amount from a qualified person (within the meaning of section 48(c)(8)(D)) with respect to which such taxpayer is considered at risk under section 48(c)(8)(B), the qualified person transfers or agrees to transfer any evidence of such indebtedness to a person who is not a qualified person, then, for purposes of paragraph (1), the taxpayer shall not be treated as ceasing to be at risk with respect to such amount.

26 USC 48.

"(3) SPECIAL RULES FOR CERTAIN ENERGY PROPERTY.—

"(A) IN GENERAL.—In the case of the second taxable year following the taxable year in which any qualified energy property (within the meaning of section 46(c)(8)(E)) is placed in service by the taxpayer and any succeeding taxable year, the taxpayer, for purposes of paragraph (1), shall be treated as ceasing to be at risk with respect to such property for such taxable year in an amount equal to the credit recapture amount (if any).

*Ante*, p. 229.

"(B) CREDIT RECAPTURE AMOUNT.—For purposes of this paragraph, the term 'credit recapture amount' means an amount equal to the excess (if any) of—

"(i) the total amount of principal to be paid as of the close of any taxable year under a nonrecourse level payment loan (as defined in section 46(c)(8)(F)(iv) other than a loan described in section 46(c)(8)(B)(ii)) with respect to such property, over

"(ii) the sum of—

"(I) the amount of principal actually paid as of the close of such taxable year, plus

"(II) the sum of the credit recapture amounts with respect to such property for all preceding taxable years.

"(C) SPECIAL RULES FOR DETERMINING PRINCIPAL TO BE PAID.—For purposes of subparagraph (B)(i), in determining the amount of the principal to be paid under a level payment loan, such determination shall be made as if such loan was to be fully repaid by the end of a period equal to the earlier of—

"(i) the present class life (as defined in section 168(g)(2)) of the property or, if the property has no present class life, a similar period determined by the Secretary, or

*Ante*, p. 203.

"(ii) the period at the end of which full repayment is to occur under the terms of the loan.

"(D) SPECIAL RULE FOR CERTAIN CUMULATIVE DEFICIENCIES.—If the excess of—

"(i) the amount of the total scheduled principal payments under a loan described in subparagraph (B)(i) as of the close of the taxable year, over

"(ii) the total principal actually paid under such loan as of the close of such taxable year,

is equal to or greater than the amount of such total scheduled payments for the 5-taxable year period ending with such taxable year, then, notwithstanding subparagraph (B), the credit recapture amount for such taxable year shall be equal to the principal remaining to be paid as of the close of

such taxable year over the sum of the credit recapture amounts with respect to such property for all preceding taxable years.

"(E) SPECIAL RULE FOR CERTAIN DISPOSITIONS.—

"(i) IN GENERAL.—If any property which is held by the taxpayer and to which this paragraph applies is disposed of by the taxpayer, then for purposes of paragraph (1) and notwithstanding subparagraph (B), the credit recapture amount for the taxpayer shall be an amount equal to the unpaid principal on the loan described in subparagraph (B)(i) as of the date of disposition;

"(ii) ASSUMPTIONS, ETC.—Any amount of the loan described in subparagraph (B)(i) which is assumed or taken subject to by any person shall be treated for purposes of clause (i) as not reducing unpaid principal with respect to such loan.

"(F) APPLICATION WITH SUBSECTION (a).—The amount of any increase in tax under subsection (a) with respect to any property to which this paragraph applies shall be determined by reducing the qualified investment with respect to such property by the aggregate credit recapture amounts for all taxable years under this paragraph.

"(G) ADDITIONAL INTEREST.—In the case of any increase in tax under paragraph (1) by reason of the application of this paragraph, there shall be added to such tax interest on such tax (determined under section 6621) as if the increase in tax under paragraph (1) was for the taxable year in which the property was placed in service."

(g) AMENDMENT OF RECAPTURE RULES.—

(1) IN GENERAL.—Subsection (a) of section 47 (relating to certain dispositions, etc, of section 38 property) is amended by redesignating paragraphs (5), (6), and (7) as paragraphs (6), (7), and (8), respectively, and by inserting after paragraph (4) the following new paragraph: 26 USC 47.

"(5) SPECIAL RULES FOR RECOVERY PROPERTY.—

"(A) GENERAL RULE.—If, during any taxable year, section 38 recovery property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer before the close of the recapture period, then, except as provided in subparagraph (D), the tax under this chapter for such taxable year shall be increased by the recapture percentage of the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from reducing to zero the qualified investment taken into account with respect to such property.

"(B) RECAPTURE PERCENTAGE.—For purposes of subparagraph (A), the recapture percentage shall be determined in accordance with the following table:

| "If the recovery property ceases to be section 38 property within— | The recapture percentage is: | |
|---|---|---|
| | For 15-year, 10-year, and 5-year property | For 3-year property |
| One full year after placed in service | 100 | 100 |
| One full year after the close of the period described in clause (i) | 80 | 66 |
| One full year after the close of the period described in clause (ii) | 60 | 33 |

| "If the recovery property ceases to be section 38 property within— | The recapture percentage is: | |
|---|---|---|
| | For 15-year, 10-year, and 5-year property | For 3-year property |
| One full year after the close of the period described in clause (iii) | 40 | 0 |
| One full year after the close of the period described in clause (iv) | 20 | 0 |

"(C) PROPERTY CEASES TO BE PROGRESS EXPENDITURE PROPERTY.—If, during any taxable year, any recovery property taken into account in determining qualified investment under section 46(d)(1) ceases to be progress expenditure property (as determined under paragraph (3)) or becomes, with respect to the taxpayer, recovery property of a character other than that expected in determining the applicable percentage under section 46(d)(1)(B)(i), then the tax under this chapter for such taxable year shall be adjusted in accordance with regulations prescribed by the Secretary.

*Ante*, p. 228.

"(D) LIMITATION.—The tax for the taxable year shall be increased under subparagraph (A) only with respect to the credits allowed under section 38 which were used to reduce tax liability. In the case of credits not so used to reduce tax liability, the carrybacks and carryovers under section 46(b) shall be appropriately adjusted.

"(E) DEFINITIONS AND SPECIAL RULES.—

"(i) SECTION 38 RECOVERY PROPERTY.—For purposes of this paragraph, the term 'section 38 recovery property' means any section 38 property which is recovery property (within the meaning of section 168).

*Ante*, p. 203.

"(ii) RECAPTURE PERIOD.—For purposes of this paragraph, the term 'recapture period' means, with respect to any recovery property, the period consisting of the first full year after the property is placed in service and the 4 succeeding full years (the 2 succeeding full years in the case of 3-year property).

"(iii) CLASSIFICATION OF PROPERTY.—For purposes of this paragraph, property shall be classifed as provided in section 168(c).

"(iv) PARAGRAPH (1) NOT TO APPLY.—Paragraph (1) shall not apply with respect to any recovery property."

(2) TECHNICAL AMENDMENTS.—

26 USC 47.

(A) Subparagraph (D) of section 47(a)(3) is amended to read as follows:

"(D) COORDINATION WITH PARAGRAPHS (1) AND (5).—If, after property is placed in service, there is a disposition or other cessation described in paragraph (1), or a disposition, cessation, or change in expected use described in paragraph (5), then paragraph (1) or (5), as the case may be, shall be applied as if any credit, which was allowable by reason of section 46(d) and which has not been required to be recaptured before such disposition, cessation, or change in use were allowable for the taxable year the property was placed in service."

(B) Paragraph (6) of section 47(a) (as redesignated by paragraph (1) of this subsection) is amended by striking out "paragraph (1) or (3)" and inserting in lieu thereof "paragraph (1), (3), or (5)".

(C) Subparagraph (B) of section 47(a)(7) (as redesignated by paragraph (1)) is amended by striking out "paragraph (5)" and inserting in lieu thereof "paragraph (6)".

(h) TREATMENT OF CERTAIN LEASED ROLLING STOCK.—Clause (ii) of section 48(a)(2)(B) is amended to read as follows: 26 USC 48.

"(ii) rolling stock which is used within and without the United States and which is—

"(I) of a domestic railroad corporation providing transportation subject to subchapter I of chapter 105 of title 49, or 49 USC 10501.

"(II) of a United States person (other than a corporation described in subclause (I)) but only if the rolling stock is not leased to one or more foreign persons for periods aggregating more than 12 months in any 24-month period;". 26 USC 46 note.

(i) EFFECTIVE DATE.—

(1) IN GENERAL.—Except as provided in this subsection, the amendments made by this section shall apply to property placed in service after December 31, 1980.

(2) PROGRESS EXPENDITURES.—The amendments made by subsection (b) shall apply to progress expenditures made after December 31, 1980.

(3) PETROLEUM STORAGE FACILITIES.—The amendments made by subsection (c) shall apply to periods after December 31, 1980, under rules similar to the rules under section 48(m).

(4) NONCORPORATE LESSORS.—The amendments made by subsection (d) shall apply to leases entered into after June 25, 1981.

(5) AT RISK RULES.—

(A) IN GENERAL.—The amendment made by subsection (f) shall not apply to—

(i) property placed in service by the taxpayer on or before February 18, 1981, and

(ii) property placed in service by the taxpayer after February 18, 1981, where such property is acquired by the taxpayer pursuant to a binding contract entered into on or before that date.

(B) BINDING CONTRACT.—For purposes of subparagraph (A)(ii), property acquired pursuant to a binding contract shall, under regulations prescribed by the Secretary, include property acquired in a manner so that it would have qualified as pretermination property under section 49(b) (as in effect before its repeal by the Revenue Act of 1978).

(6) LEASED ROLLING STOCK.—The amendment made by subsection (h) shall apply to taxable years beginning after December 31, 1980.

### SEC. 212. INCREASE IN INVESTMENT TAX CREDIT FOR QUALIFIED REHABILITATION EXPENDITURES.

(a) INCREASE IN AMOUNT OF CREDIT.—

(1) IN GENERAL.—Subparagraph (A) of section 46(a)(2) (relating to amount of investment tax credit) is amended by striking out "and" at the end of clause (ii), by striking out the period at the end of clause (iii), by inserting in lieu thereof ", and", and by adding at the end thereof the following new clause: 26 USC 46.

"(iv) in the case of that portion of the basis of any property which is attributable to qualified rehabilitation expenditures, the rehabilitation percentage.".

§ **465**. Deductions limited to amount at risk

**(a) Limitation to amount at risk.--**

**(1) In general.**--In the case of--

**(A)** an individual, and

**(B)** a C corporation with respect to which the stock ownership requirement of paragraph (2) of section 542(a) is met,

engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year.

**(2) Deduction in succeeding year.**--Any loss from an activity to which this section applies not allowed under this section for the taxable year shall be treated as a deduction allocable to such activity in the first succeeding taxable year.

**(3) Special rules for applying paragraph (1)(B).**--For purposes of paragraph (1)(B)--

**(A)**section 544(a)(2) shall be applied as if such section did not contain the phrase "or by or for his partner"; and

**(B)**sections 544(a)(4)(A) and 544(b)(1) shall be applied by substituting "the corporation meet [FN1] the stock ownership requirements of section 542(a)(2)" for "the corporation a personal holding company".

**(b) Amounts considered at risk.--**

**(1) In general.**--For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including--

**(A)** the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and

**(B)** amounts borrowed with respect to such activity (as determined under paragraph (2)).

**(2) Borrowed amounts.**--For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he--

**(A)** is personally liable for the repayment of such amounts, or

**(B)** has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

**(3) Certain borrowed amounts excluded.--**

**(A) In general.**--Except to the extent provided in regulations, for purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who has an interest in such activity or from a related person to a person (other than the taxpayer) having such an interest.

**(B) Exceptions.--**

**(i) Interest as creditor.**--Subparagraph (A) shall not apply to an interest as a creditor in the activity.

**(ii) Interest as shareholder with respect to amounts borrowed by corporation.**-- In the case of amounts borrowed by a corporation from a shareholder, subparagraph (A) shall not apply to an interest as a shareholder.

**(C) Related person.**--For purposes of this subsection, a person (hereinafter in this paragraph referred to as the "related person") is related to any person if--

**(i)** the related person bears a relationship to such person specified in section 267(b) or section 707(b)(1), or

**(ii)** the related person and such person are engaged in trades or business under common control (within the meaning of subsections (a) and (b) of section 52).

For purposes of clause (i), in applying section 267(b) or 707(b)(1), "10 percent" shall be substituted for "50 percent".

**(4) Exception.**--Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

**(5) Amounts at risk in subsequent years.**--If in any taxable year the taxpayer has a loss from an activity to which subsection (a) applies, the amount with respect to which a taxpayer is considered to be at risk (within the meaning of subsection (b)) in subsequent taxable years with respect to that activity shall be reduced by that portion of the loss which (after the application of subsection (a)) is allowable as a deduction.

**(6) Qualified nonrecourse financing treated as amount at risk.**--For purposes of this section--

**(A) In general.**--Notwithstanding any other provision of this subsection, in the case of an activity of holding real property, a taxpayer shall be considered at risk with respect to the taxpayer's share of any qualified nonrecourse financing which is secured by real property used in such activity.

**(B) Qualified nonrecourse financing.**--For purposes of this paragraph, the term "qualified nonrecourse financing" means any financing--

**(i)** which is borrowed by the taxpayer with respect to the activity of holding real property,

**(ii)** which is borrowed by the taxpayer from a qualified person or represents a loan from any Federal, State, or local government or instrumentality thereof, or is guaranteed by any Federal, State, or local government,

**(iii)** except to the extent provided in regulations, with respect to which no person is personally liable for repayment, and

**(iv)** which is not convertible debt.

**(C) Special rule for partnerships.**--In the case of a partnership, a partner's share of any qualified nonrecourse financing of such partnership shall be determined on the basis of the partner's share of liabilities of such partnership incurred in connection with such financing (within the meaning of section 752).

**(D) Qualified person defined.**--For purposes of this paragraph--

**(i) In general.**--The term "qualified person" has the meaning given such term by section 49(a)(1)(D)(iv).

**(ii) Certain commercially reasonable financing from related persons.**--For purposes of clause (i), section 49(a)(1)(D)(iv) shall be applied without regard to subclause (I) thereof (relating to financing from related persons) if the financing from the related person is commercially reasonable and on substantially the same terms as loans involving unrelated persons.

**(E) Activity of holding real property.**--For purposes of this paragraph--

**(i) Incidental personal property and services.**--The activity of holding real property includes the holding of personal property and the providing of services which are incidental to making real property available as living accommodations.

**(ii) Mineral property.**--The activity of holding real property shall not include the holding of mineral property.

**(c) Activities to which section applies.**--

**(1) Types of activities.**--This section applies to any taxpayer engaged in the activity of--

**(A)** holding, producing, or distributing motion picture films or video tapes,

**(B)** farming (as defined in section 464(e)),

**(C)** leasing any section 1245 property (as defined in section 1245(a)(3)),

**(D)** exploring for, or exploiting, oil and gas resources or

**(E)** exploring for, or exploiting, geothermal deposits (as defined in section 613(e)(2))

as a trade or business or for the production of income.

**(2) Separate activities.**--For purposes of this section--

**(A) In general.**--Except as provided in subparagraph (B), a taxpayer's activity with respect to each--

**(i)** film or video tape,

**(ii)**section 1245 property which is leased or held for leasing,

**(iii)** farm,

**(iv)** oil and gas property (as defined under section 614), or

**(v)** geothermal property (as defined under section 614),

shall be treated as a separate activity.

**(B) Aggregation rules.**--

**(i) Special rule for leases of section 1245 property by partnerships or S corporations.**--In the case of any partnership or S corporation, all activities with respect to section 1245 properties which--

**(I)** are leased or held for lease, and

**(II)** are placed in service in any taxable year of the partnership or S corporation,

shall be treated as a single activity.

**(ii) Other aggregation rules.**--Rules similar to the rules of subparagraphs (B) and (C) of paragraph (3) shall apply for purposes of this paragraph.

**(3) Extension to other activities.**--

**(A) In general.**--In the case of taxable years beginning after December 31, 1978, this section also applies to each activity--

**(i)** engaged in by the taxpayer in carrying on a trade or business or for the production of income, and

**(ii)** which is not described in paragraph (1).

**(B) Aggregation of activities where taxpayer actively participates in management of trade or business.**--Except as provided in subparagraph (C), for purposes of this section, activities described in subparagraph (A) which constitute a trade or business shall be treated as one activity if--

**(i)** the taxpayer actively participates in the management of such trade or business, or

**(ii)** such trade or business is carried on by a partnership or an S corporation and 65 percent or more of the losses for the taxable year is allocable to persons who actively participate in the management of the trade or business.

**(C) Aggregation or separation of activities under regulations.**--The Secretary shall prescribe regulations under which activities described in subparagraph (A) shall be aggregated or treated as separate activities.

**(D) Application of subsection (b)(3).**--In the case of an activity described in subparagraph (A), subsection (b)(3) shall apply only to the extent provided in regulations prescribed by the Secretary.

**(4) Exclusion for certain equipment leasing by closely-held corporations.--**

**(A) In general.**--In the case of a corporation described in subsection (a)(1)(B) actively engaged in equipment leasing--

**(i)** the activity of equipment leasing shall be treated as a separate activity, and

**(ii)** subsection (a) shall not apply to losses from such activity.

**(B) 50-percent gross receipts test.**--For purposes of subparagraph (A), a corporation shall not be considered to be actively engaged in equipment leasing unless 50 percent or more of the gross receipts of the corporation for the taxable year is attributable, under regulations prescribed by the Secretary, to equipment leasing.

**(C) Component members of controlled group treated as a single corporation.**--For

purposes of subparagraph (A), the component members of a controlled group of corporations shall be treated as a single corporation.

**(5) Waiver of controlled group rule where there is substantial leasing activity.--**

**(A) In general.**--In the case of the component members of a qualified leasing group, paragraph (4) shall be applied--

**(i)** by substituting "80 percent" for "50 percent" in subparagraph (B) thereof, and

**(ii)** as if paragraph (4) did not include subparagraph (C) thereof.

**(B) Qualified leasing group.**--For purposes of this paragraph, the term "qualified leasing group" means a controlled group of corporations which, for the taxable year and each of the 2 immediately preceding taxable years, satisfied each of the following 3 requirements:

**(i) At least 3 employees.**--During the entire year, the group had at least 3 full-time employees substantially all of the services of whom were services directly related to the equipment leasing activity of the qualified leasing members.

**(ii) At least 5 separate leasing transactions.**--During the year, the qualified leasing members in the aggregate entered into at least 5 separate equipment leasing transactions.

**(iii) At least $1,000,000 equipment leasing receipts.**--During the year, the qualified leasing members in the aggregate had at least $1,000,000 in gross receipts from equipment leasing.

The term "qualified leasing group" does not include any controlled group of corporations to which, without regard to this paragraph, paragraph (4) applies.

**(C) Qualified leasing member.**--For purposes of this paragraph, a corporation shall be treated as a qualified leasing member for the taxable year only if for each of the taxable years referred to in subparagraph (B)--

**(i)** it is a component member of the controlled group of corporations, and

**(ii)** it meets the requirements of paragraph (4)(B) (as modified by subparagraph (A)(i) of this paragraph).

**(6) Definitions relating to paragraphs (4) and (5).**--For purposes of paragraphs (4) and (5)--

**(A) Equipment leasing.**--The term "equipment leasing" means--

**(i)** the leasing of equipment which is section 1245 property, and

**(ii)** the purchasing, servicing, and selling of such equipment.

**(B) Leasing of master sound recordings, etc., excluded.**--The term "equipment leasing" does not include the leasing of master sound recordings, and other similar contractual arrangements with respect to tangible or intangible assets associated with literary, artistic, or musical properties.

**(C) Controlled group of corporations; component member.**--The terms "controlled group of corporations" and "component member" have the same meanings as when used in section 1563. The determination of the taxable years taken into account with respect to any controlled group of corporations shall be made in a manner consistent with the manner set forth in section 1563.

**(7) Exclusion of active businesses of qualified C corporations.--**

**(A) In general.**--In the case of a taxpayer which is a qualified C corporation--

**(i)** each qualifying business carried on by such taxpayer shall be treated as a separate activity, and

**(ii)** subsection (a) shall not apply to losses from such business.

**(B) Qualified C corporation.**--For purposes of subparagraph (A), the term "qualified C corporation" means any corporation described in subparagraph (B) of subsection (a)(1) which is not--

**(i)** a personal holding company (as defined in section 542(a)), or

**(ii)** a personal service corporation (as defined in section 269A(b) but determined by substituting "5 percent" for "10 percent" in section 269A(b)(2)).

[**(iii)** Redesignated (ii)]

**(C) Qualifying business.**--For purposes of this paragraph, the term "qualifying business" means any active business if--

**(i)** during the entire 12-month period ending on the last day of the taxable year, such corporation had at least 1 full-time employee substantially all the services of whom were in the active management of such business,

**(ii)** during the entire 12-month period ending on the last day of the taxable year, such

corporation had at least 3 full-time, nonowner employees substantially all of the services of whom were services directly related to such business,

**(iii)** the amount of the deductions attributable to such business which are allowable to the taxpayer solely by reason of sections 162 and 404 for the taxable year exceeds 15 percent of the gross income from such business for such year, and

**(iv)** such business is not an excluded business.

**(D) Special rules for application of subparagraph (C).--**

**(i) Partnerships in which taxpayer is a qualified corporate partner.**--In the case of an active business of a partnership, if--

**(I)** the taxpayer is a qualified corporate partner in the partnership, and

**(II)** during the entire 12-month period ending on the last day of the partnership's taxable year, there was at least 1 full-time employee of the partnership (or of a qualified corporate partner) substantially all the services of whom were in the active management of such business,

then the taxpayer's proportionate share (determined on the basis of its profits interest) of the activities of the partnership in such business shall be treated as activities of the taxpayer (and clause (i) of subparagraph (C) shall not apply in determining whether such business is a qualifying business of the taxpayer).

**(ii) Qualified corporate partner.**--For purposes of clause (i), the term "qualified corporate partner" means any corporation if--

**(I)** such corporation is a general partner in the partnership,

**(II)** such corporation has an interest of 10 percent or more in the profits and losses of the partnership, and

**(III)** such corporation has contributed property to the partnership in an amount not less than the lesser of $500,000 or 10 percent of the net worth of the corporation.

For purposes of subclause (III), any contribution of property other than money shall be taken into account at its fair market value.

**(iii) Deduction for owner employee compensation not taken into account.**--For purposes of clause (iii) of subparagraph (C), there shall not be taken into account any deduction in respect of compensation for personal services rendered by any employee (other than a non-owner employee) of the taxpayer or any member of such employee's family (within the meaning of section 318(a)(1)).

**(iv) Special rule for banks.**--For purposes of clause (iii) of subparagraph (C), in the case of a bank (as defined in section 581) or a financial institution to which section 591 applies--

**(I)** gross income shall be determined without regard to the exclusion of interest from gross income under section 103, and

**(II)** in addition to the deductions described in such clause, there shall also be taken into account the amount of the deductions which are allowable for amounts paid or credited to the accounts of depositors or holders of accounts as dividends or interest on their deposits or withdrawable accounts under section 163 or 591.

**(v) Special rule for life insurance companies.**--

**(I) In general.**--Clause (iii) of subparagraph (C) shall not apply to any insurance business of a qualified life insurance company.

**(II) Insurance business.**--For purposes of subclause (I), the term "insurance business" means any business which is not a noninsurance business (within the meaning of section 806(b)(3)).

**(III) Qualified life insurance company.**--For purposes of subclause (I), the term "qualified life insurance company" means any company which would be a life insurance company as defined in section 816 if unearned premiums were not taken into account under subsections (a)(2) and (c)(2) of section 816.

**(E) Definitions.**--For purposes of this paragraph--

**(i) Non-owner employee.**--The term "non-owner employee" means any employee who does not own, at any time during the taxable year, more than 5 percent in value of the outstanding stock of the taxpayer. For purposes of the preceding sentence, section 318 shall apply, except that "5 percent" shall be substituted for "50 percent" in section 318(a)(2)(C).

**(ii) Excluded business.**--The term "excluded business" means--

**(I)** equipment leasing (as defined in paragraph (6)), and

**(II)** any business involving the use, exploitation, sale, lease, or other disposition of master sound recordings, motion picture films, video tapes, or tangible or intangible assets associated with literary, artistic, musical, or similar properties.

**(iii) Special rules relating to communications industry, etc.--**

**(I) Business not excluded where taxpayer not completely at risk.**--A business involving the use, exploitation, sale, lease, or other disposition of property described in subclause (II) of clause (ii) shall not constitute an excluded business by reason of such subclause if the taxpayer is at risk with respect to all amounts paid or incurred (or chargeable to capital account) in such business.

**(II) Certain licensed businesses not excluded.**--For purposes of subclause (II) of clause (ii), the provision of radio, television, cable television, or similar services pursuant to a license or franchise granted by the Federal Communications Commission or any other Federal, State, or local authority shall not constitute an excluded business by reason of such subclause.

**(F) Affiliated group treated as 1 taxpayer.**--For purposes of this paragraph--

**(i) In general.**--Except as provided in subparagraph (G), the component members of an affiliated group of corporations shall be treated as a single taxpayer.

**(ii) Affiliated group of corporations.**--The term "affiliated group of corporations" means an affiliated group (as defined in section 1504(a)) which files or is required to file consolidated income tax returns.

**(iii) Component member.**--The term "component member" means an includible corporation (as defined in section 1504) which is a member of the affiliated group.

**(G) Loss of 1 member of affiliated group may not offset income of personal holding company or personal service corporation.**--Nothing in this paragraph shall permit any loss of a member of an affiliated group to be used as an offset against the income of any other member of such group which is a personal holding company (as defined in section 542(a)) or a personal service corporation (as defined in section 269A(b) but determined by substituting "5 percent" for "10 percent" in section 269A(b)(2)).

**(d) Definition of loss.**--For purposes of this section, the term "loss" means the excess of the deductions allowable under this chapter for the taxable year (determined without regard to the first sentence of subsection (a)) and allocable to an activity to which this section applies over the income received or accrued by the taxpayer during the taxable year from such activity (determined without regard to subsection (e)(1)(A)).

**(e) Recapture of losses where amount at risk is less than zero.--**

**(1) In general.**--If zero exceeds the amount for which the taxpayer is at risk in any activity at the close of any taxable year--

**(A)** the taxpayer shall include in his gross income for such taxable year (as income from such activity) an amount equal to such excess, and

**(B)** an amount equal to the amount so included in gross income shall be treated as a deduction allocable to such activity for the first succeeding taxable year.

**(2) Limitation.**--The excess referred to in paragraph (1) shall not exceed--

**(A)** the aggregate amount of the reductions required by subsection (b)(5) with respect to the activity by reason of losses for all prior taxable years beginning after December 31, 1978, reduced by

**(B)** the amounts previously included in gross income with respect to such activity under this subsection.

****

SUBPART C--TAXABLE YEAR FOR WHICH DEDUCTIONS TAKEN

**§ 469**. Passive activity losses and credits limited

**(a) Disallowance.--**

**(1) In general.**--If for any taxable year the taxpayer is described in paragraph (2), neither--

**(A)** the passive activity loss, nor

**(B)** the passive activity credit,

for the taxable year shall be allowed.

**(2) Persons described.**--The following are described in this paragraph:

**(A)** any individual, estate, or trust,

**(B)** any closely held C corporation, and

**(C)** any personal service corporation.

**(b) Disallowed loss or credit carried to next year.**--Except as otherwise provided in this section, any loss or credit from an activity which is disallowed under subsection (a) shall be treated as a deduction or credit allocable to such activity in the next taxable year.

**(c) Passive activity defined.**--For purposes of this section--

**(1) In general.**--The term "passive activity" means any activity--

**(A)** which involves the conduct of any trade or business, and

3352357.1

**(B)** in which the taxpayer does not materially participate.

**(2) Passive activity includes any rental activity.**--Except as provided in paragraph (7), the term "passive activity" includes any rental activity.

**(3) Working interests in oil and gas property.--**

**(A) In general.**--The term "passive activity" shall not include any working interest in any oil or gas property which the taxpayer holds directly or through an entity which does not limit the liability of the taxpayer with respect to such interest.

**(B) Income in subsequent years.**--If any taxpayer has any loss for any taxable year from a working interest in any oil or gas property which is treated as a loss which is not from a passive activity, then any net income from such property (or any property the basis of which is determined in whole or in part by reference to the basis of such property) for any succeeding taxable year shall be treated as income of the taxpayer which is not from a passive activity. If the preceding sentence applies to the net income from any property for any taxable year, any credits allowable under subpart B (other than section 27(a)) or D of part IV of subchapter A for such taxable year which are attributable to such property shall be treated as credits not from a passive activity to the extent the amount of such credits does not exceed the regular tax liability of the taxpayer for the taxable year which is allocable to such net income.

**(4) Material participation not required for paragraphs (2) and (3).--** Paragraphs (2) and (3) shall be applied without regard to whether or not the taxpayer materially participates in the activity.

**(5) Trade or business includes research and experimentation activity.**--For purposes of paragraph (1)(A), the term "trade or business" includes any activity involving research or experimentation (within the meaning of section 174).

**(6) Activity in connection with trade or business or production of income.**--To the extent provided in regulations, for purposes of paragraph (1)(A), the term "trade or business" includes--

**(A)** any activity in connection with a trade or business, or

**(B)** any activity with respect to which expenses are allowable as a deduction under section 212.

**(7) Special rules for taxpayers in real property business.--**

**(A) In general.**--If this paragraph applies to any taxpayer for a taxable year--

**(i)** paragraph (2) shall not apply to any rental real estate activity of such taxpayer for such taxable year, and

**(ii)** this section shall be applied as if each interest of the taxpayer in rental real estate were a separate activity.

Notwithstanding clause (ii), a taxpayer may elect to treat all interests in rental real estate as one activity. Nothing in the preceding provisions of this subparagraph shall be construed as affecting the determination of whether the taxpayer materially participates with respect to any interest in a limited partnership as a limited partner.

**(B) Taxpayers to whom paragraph applies.**--This paragraph shall apply to a taxpayer for a taxable year if--

**(i)** more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

**(ii)** such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

In the case of a joint return, the requirements of the preceding sentence are satisfied if and only if either spouse separately satisfies such requirements. For purposes of the preceding sentence, activities in which a spouse materially participates shall be determined under subsection (h).

3352357.1

**(C) Real property trade or business.**--For purposes of this paragraph, the term "real property trade or business" means any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business.

**(D) Special rules for subparagraph (B).--**

**(i) Closely held C corporations.**--In the case of a closely held C corporation, the requirements of subparagraph (B) shall be treated as met for any taxable year if more than 50 percent of the gross receipts of such corporation for such taxable year are derived from real property trades or businesses in which the corporation materially participates.

**(ii) Personal services as an employee.**--For purposes of subparagraph (B), personal services performed as an employee shall not be treated as performed in real property trades or businesses. The preceding sentence shall not apply if such employee is a 5-percent owner (as defined in section 416(i)(1)(B)) in the employer.

**(d) Passive activity loss and credit defined.**--For purposes of this section--

**(1) Passive activity loss.**--The term "passive activity loss" means the amount (if any) by which--

**(A)** the aggregate losses from all passive activities for the taxable year, exceed

**(B)** the aggregate income from all passive activities for such year.

**(2) Passive activity credit.**--The term "passive activity credit" means the amount (if any) by which--

**(A)** the sum of the credits from all passive activities allowable for the taxable year under--

**(i)** subpart D of part IV of subchapter A, or

3352357.1

**(ii)** subpart B (other than section 27(a)) of such part IV, exceeds

**(B)** the regular tax liability of the taxpayer for the taxable year allocable to all passive activities.

**(e) Special rules for determining income or loss from a passive activity.**--For purposes of this section--

**(1) Certain income not treated as income from passive activity.**--In determining the income or loss from any activity--

**(A) In general.**--There shall not be taken into account--

**(i)** any--

**(I)** gross income from interest, dividends, annuities, or royalties not derived in the ordinary course of a trade or business,

**(II)** expenses (other than interest) which are clearly and directly allocable to such gross income, and

**(III)** interest expense properly allocable to such gross income, and

**(ii)** gain or loss not derived in the ordinary course of a trade or business which is attributable to the disposition of property--

**(I)** producing income of a type described in clause (i), or

**(II)** held for investment.

For purposes of clause (ii), any interest in a passive activity shall not be treated as property held for investment.

**(B) Return on working capital.**--For purposes of subparagraph (A), any income, gain, or loss which is attributable to an investment of working capital shall be treated as not derived in the ordinary course of a trade or business.

**(2) Passive losses of certain closely held corporations may offset active income.--**

**(A) In general.**--If a closely held C corporation (other than a personal service corporation) has net active income for any taxable year, the passive activity loss of such taxpayer for such taxable year (determined without regard to this paragraph)--

**(i)** shall be allowable as a deduction against net active income, and

**(ii)** shall not be taken into account under subsection (a) to the extent so allowable as a deduction.

A similar rule shall apply in the case of any passive activity credit of the taxpayer.

**(B) Net active income.**--For purposes of this paragraph, the term "net active income" means the taxable income of the taxpayer for the taxable year determined without regard to--

**(i)** any income or loss from a passive activity, and

**(ii)** any item of gross income, expense, gain, or loss described in paragraph (1)(A).

**(3) Compensation for personal services.**--Earned income (within the meaning of section 911(d)(2)(A)) shall not be taken into account in computing the income or loss from a passive activity for any taxable year.

**(4) Dividends reduced by dividends received deduction.--**For purposes of paragraphs (1) and (2), income from dividends shall be reduced by the amount of any dividends received

deduction under section 243, 244, or 245.

**(f) Treatment of former passive activities.**--For purposes of this section--

**(1) In general.**--If an activity is a former passive activity for any taxable year--

**(A)** any unused deduction allocable to such activity under subsection (b) shall be offset against the income from such activity for the taxable year,

**(B)** any unused credit allocable to such activity under subsection (b) shall be offset against the regular tax liability (computed after the application of paragraph (1)) allocable to such activity for the taxable year, and

**(C)** any such deduction or credit remaining after the application of subparagraphs (A) and (B) shall continue to be treated as arising from a passive activity.

**(2) Change in status of closely held C corporation or personal service corporation.**--If a taxpayer ceases for any taxable year to be a closely held C corporation or personal service corporation, this section shall continue to apply to losses and credits to which this section applied for any preceding taxable year in the same manner as if such taxpayer continued to be a closely held C corporation or personal service corporation, whichever is applicable.

**(3) Former passive activity.**--The term "former passive activity" means any activity which, with respect to the taxpayer--

**(A)** is not a passive activity for the taxable year, but

**(B)** was a passive activity for any prior taxable year.

**(g) Dispositions of entire interest in passive activity.**--If during the taxable year a taxpayer disposes of his entire interest in any passive activity (or former passive activity), the following rules shall apply:

**(1) Fully taxable transaction.--**

**(A) In general.**--If all gain or loss realized on such disposition is recognized, the excess of--

**(i)** any loss from such activity for such taxable year (determined after the application of subsection (b)), over

**(ii)** any net income or gain for such taxable year from all other passive activities (determined after the application of subsection (b)),

shall be treated as a loss which is not from a passive activity.

**(B) Subparagraph (A) not to apply to disposition involving related party.**--If the taxpayer and the person acquiring the interest bear a relationship to each other described in section 267(b) or section 707(b)(1), then subparagraph (A) shall not apply to any loss of the taxpayer until the taxable year in which such interest is acquired (in a transaction described in subparagraph (A)) by another person who does not bear such a relationship to the taxpayer.

**(C) Income from prior years.**--To the extent provided in regulations, income or gain from the activity for preceding taxable years shall be taken into account under subparagraph (A)(ii) for the taxable year to the extent necessary to prevent the avoidance of this section.

**(2) Disposition by death.**--If an interest in the activity is transferred by reason of the death of the taxpayer--

**(A)** paragraph (1)(A) shall apply to losses described in paragraph (1)(A) to the extent such losses are greater than the excess (if any) of--

**(i)** the basis of such property in the hands of the transferee, over

**(ii)** the adjusted basis of such property immediately before the death of the taxpayer, and

**(B)** any losses to the extent of the excess described in subparagraph (A) shall not be allowed

as a deduction for any taxable year.

**(3) Installment sale of entire interest.**--In the case of an installment sale of an entire interest in an activity to which section 453 applies, paragraph (1) shall apply to the portion of such losses for each taxable year which bears the same ratio to all such losses as the gain recognized on such sale during such taxable year bears to the gross profit from such sale (realized or to be realized when payment is completed).

**(h) Material participation defined.**--For purposes of this section--

**(1) In general.**--A taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a basis which is--

**(A)** regular,

**(B)** continuous, and

**(C)** substantial.

**(2) Interests in limited partnerships.**--Except as provided in regulations, no interest in a limited partnership as a limited partner shall be treated as an interest with respect to which a taxpayer materially participates.

**(3) Treatment of certain retired individuals and surviving spouses.**--A taxpayer shall be treated as materially participating in any farming activity for a taxable year if paragraph (4) or (5) of section 2032A(b) would cause the requirements of section 2032A(b)(1)(C)(ii) to be met with respect to real property used in such activity if such taxpayer had died during the taxable year.

**(4) Certain closely held C corporations and personal service corporations.**--A closely held C corporation or personal service corporation shall be treated as materially participating in an activity only if--

**(A)** 1 or more shareholders holding stock representing more than 50 percent (by value) of the

outstanding stock of such corporation materially participate in such activity, or

**(B)** in the case of a closely held C corporation (other than a personal service corporation), the requirements of section 465(c)(7)(C) (without regard to clause (iv)) are met with respect to such activity.

**(5) Participation by spouse.**--In determining whether a taxpayer materially participates, the participation of the spouse of the taxpayer shall be taken into account.

**(i) $25,000 offset for rental real estate activities.--**

**(1) In general.**--In the case of any natural person, subsection (a) shall not apply to that portion of the passive activity loss or the deduction equivalent (within the meaning of subsection (j)(5)) of the passive activity credit for any taxable year which is attributable to all rental real estate activities with respect to which such individual actively participated in such taxable year (and if any portion of such loss or credit arose in another taxable year, in such other taxable year).

**(2) Dollar limitation.**--The aggregate amount to which paragraph (1) applies for any taxable year shall not exceed $25,000.

**(3) Phase-out of exemption.--**

**(A) In general.**--In the case of any taxpayer, the $25,000 amount under paragraph (2) shall be reduced (but not below zero) by 50 percent of the amount by which the adjusted gross income of the taxpayer for the taxable year exceeds $100,000.

**(B) Special phase-out of rehabilitation credit.**--In the case of any portion of the passive activity credit for any taxable year which is attributable to the rehabilitation credit determined under section 47, subparagraph (A) shall be applied by substituting "$200,000" for "$100,000".

**(C) Exception for commercial revitalization deduction.**--Subparagraph (A) shall not apply to any portion of the passive activity loss for any taxable year which is attributable to the commercial revitalization deduction under section 1400I.

**(D) Exception for low-income housing credit.**--Subparagraph (A) shall not apply to any portion of the passive activity credit for any taxable year which is attributable to any credit determined under section 42.

**(E) Ordering rules to reflect exceptions and separate phase-outs.**--If subparagraph (B), (C), or (D) applies for a taxable year, paragraph (1) shall be applied--

**(i)** first to the portion of the passive activity loss to which subparagraph (C) does not apply,

**(ii)** second to the portion of such loss to which subparagraph (C) applies,

**(iii)** third to the portion of the passive activity credit to which subparagraph (B) or (D) does not apply,

**(iv)** fourth to the portion of such credit to which subparagraph (B) applies, and

**(v)** then to the portion of such credit to which subparagraph (D) applies.

**(F) Adjusted gross income.**--For purposes of this paragraph, adjusted gross income shall be determined without regard to--

**(i)** any amount includible in gross income under section 86,

**(ii)** the amounts excludable from gross income under sections 135 and 137,

**(iii)** the amounts allowable as a deduction under sections 199, 219, 221, and 222, and

**(iv)** any passive activity loss or any loss allowable by reason of subsection (c)(7).

**(4) Special rule for estates.--**

**(A) In general.**--In the case of taxable years of an estate ending less than 2 years after the date of the death of the decedent, this subsection shall apply to all rental real estate activities with respect to which such decedent actively participated before his death.

**(B) Reduction for surviving spouse's exemption.**--For purposes of subparagraph (A), the $25,000 amount under paragraph (2) shall be reduced by the amount of the exemption under paragraph (1) (without regard to paragraph (3)) allowable to the surviving spouse of the decedent for the taxable year ending with or within the taxable year of the estate.

**(5) Married individuals filing separately.--**

**(A) In general.**--Except as provided in subparagraph (B), in the case of any married individual filing a separate return, this subsection shall be applied by substituting--

**(i)** "$12,500" for "$25,000" each place it appears,

**(ii)** "$50,000" for "$100,000" in paragraph (3)(A), and

**(iii)** "$100,000" for "$200,000" in paragraph (3)(B).

**(B) Taxpayers not living apart.**--This subsection shall not apply to a taxpayer who--

**(i)** is a married individual filing a separate return for any taxable year, and

**(ii)** does not live apart from his spouse at all times during such taxable year.

**(6) Active participation.--**

**(A) In general.**--An individual shall not be treated as actively participating with respect to any interest in any rental real estate activity for any period if, at any time during such period, such interest (including any interest of the spouse of the individual) is less than 10 percent (by value) of all interests in such activity.

3352357.1

**(B) No participation requirement for low-income housing, or rehabilitation credit, or commercial revitalization deduction.**--Paragraphs (1) and (4)(A) shall be applied without regard to the active participation requirement in the case of--

**(i)** any credit determined under section 42 for any taxable year,

**(ii)** any rehabilitation credit determined under section 47, or.

**(iii)** any deduction under section 1400I (relating to commercial revitalization deduction).

**(C) Interest as a limited partner.**--Except as provided in regulations, no interest as a limited partner in a limited partnership shall be treated as an interest with respect to which the taxpayer actively participates.

**(D) Participation by spouse.**--In determining whether a taxpayer actively participates, the participation of the spouse of the taxpayer shall be taken into account.

**(j) Other definitions and special rules.**--For purposes of this section--

**(1) Closely held C corporation.**--The term "closely held C corporation" means any C corporation described in section 465(a)(1)(B).

**(2) Personal service corporation.**--The term "personal service corporation" has the meaning given such term by section 269A(b)(1), except that section 269A(b)(2) shall be applied--

**(A)** by substituting "any" for "more than 10 percent", and

**(B)** by substituting "any" for "50 percent or more in value" in section 318(a)(2)(C).

A corporation shall not be treated as a personal service corporation unless more than 10 percent of the stock (by value) in such corporation is held by employee-owners (within the meaning of section 269A(b)(2), as modified by the preceding sentence).

**(3) Regular tax liability.**--The term "regular tax liability" has the meaning given such term by section 26(b).

**(4) Allocation of passive activity loss and credit.**--The passive activity loss and the passive activity credit (and the $25,000 amount under subsection (i)) shall be allocated to activities, and within activities, on a pro rata basis in such manner as the Secretary may prescribe.

**(5) Deduction equivalent.**--The deduction equivalent of credits from a passive activity for any taxable year is the amount which (if allowed as a deduction) would reduce the regular tax liability for such taxable year by an amount equal to such credits.

**(6) Special rule for gifts.**--In the case of a disposition of any interest in a passive activity by gift--

**(A)** the basis of such interest immediately before the transfer shall be increased by the amount of any passive activity losses allocable to such interest with respect to which a deduction has not been allowed by reason of subsection (a), and

**(B)** such losses shall not be allowable as a deduction for any taxable year.

**(7) Qualified residence interest.**--The passive activity loss of a taxpayer shall be computed without regard to qualified residence interest (within the meaning of section 163(h)(3)).

**(8) Rental activity.**--The term "rental activity" means any activity where payments are principally for the use of tangible property.

**(9) Election to increase basis of property by amount of disallowed credit.**--For purposes of determining gain or loss from a disposition of any property to which subsection (g)(1) applies, the transferor may elect to increase the basis of such property immediately before the transfer by an amount equal to the portion of any unused credit allowable under this chapter which reduced the basis of such property for the taxable year in which such credit arose. If the taxpayer elects the application of this paragraph, such portion of the passive activity credit of such taxpayer shall not be allowed for any taxable year.

**(10) Coordination with section 280A.**--If a passive activity involves the use of a dwelling unit

to which section 280A(c)(5) applies for any taxable year, any income, deduction, gain, or loss allocable to such use shall not be taken into account for purposes of this section for such taxable year.

**(11) Aggregation of members of affiliated groups.**--Except as provided in regulations, all members of an affiliated group which files a consolidated return shall be treated as 1 corporation.

**(12) Special rule for distributions by estates or trusts.**--If any interest in a passive activity is distributed by an estate or trust--

**(A)** the basis of such interest immediately before such distribution shall be increased by the amount of any passive activity losses allocable to such interest, and

**(B)** such losses shall not be allowable as a deduction for any taxable year.

**(k) Separate application of section in case of publicly traded partnerships.--**

**(1) In general.**--This section shall be applied separately with respect to items attributable to each publicly traded partnership (and subsection (i) shall not apply with respect to items attributable to any such partnership). The preceding sentence shall not apply to any credit determined under section 42, or any rehabilitation credit determined under section 47, attributable to a publicly traded partnership to the extent the amount of any such credits exceeds the regular tax liability attributable to income from such partnership.

**(2) Publicly traded partnership.**--For purposes of this section, the term "publicly traded partnership" means any partnership if--

**(A)** interests in such partnership are traded on an established securities market, or

**(B)** interests in such partnership are readily tradable on a secondary market (or the substantial equivalent thereof).

**(3) Coordination with subsection (g).**--For purposes of subsection (g), a taxpayer shall not be

treated as having disposed of his entire interest in an activity of a publicly traded partnership until he disposes of his entire interest in such partnership.

**(4) Application to regulated investment companies.**--For purposes of this section, a regulated investment company (as defined in section 851) holding an interest in a qualified publicly traded partnership (as defined in section 851(h)) shall be treated as a taxpayer described in subsection (a)(2) with respect to items attributable to such interest.

**(l) Regulations.**--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out provisions of this section, including regulations--

**(1)** which specify what constitutes an activity, material participation, or active participation for purposes of this section,

**(2)** which provide that certain items of gross income will not be taken into account in determining income or loss from any activity (and the treatment of expenses allocable to such income),

**(3)** requiring net income or gain from a limited partnership or other passive activity to be treated as not from a passive activity,

**(4)** which provide for the determination of the allocation of interest expense for purposes of this section, and

**(5)** which deal with changes in marital status and changes between joint returns and separate returns.

**(m) Phase-in of disallowance of losses and credits for interest held before date of enactment.--**

**(1) In general.**--In the case of any passive activity loss or passive activity credit for any taxable year beginning in calendar years 1987 through 1990, subsection (a) shall not apply to the applicable percentage of that portion of such loss (or such credit) which is attributable to pre-enactment interests.

3352357.1

**(2) Applicable percentage.**--For purposes of this subsection, the applicable percentage shall be determined in accordance with the following table:

| In the case of taxable years beginning in: | The applicable percentage is: |
|---|---|
| 1987 | 65 |
| 1988 | 40 |
| 1989 | 20 |
| 1990 | 10. |

**(3) Portion of loss or credit attributable to pre-enactment interests.**--For purposes of this subsection--

**(A) In general.**--The portion of the passive activity loss (or passive activity credit) for any taxable year which is attributable to pre-enactment interests is the lesser of--

**(i)** the amount of the passive activity loss (or passive activity credit) which is disallowed for the taxable year under subsection (a) (without regard to this subsection), or

**(ii)** the amount of the passive activity loss (or passive activity credit) which would be disallowed for the taxable year (without regard to this subsection and without regard to any amount allocable to an activity for the taxable year under subsection (b)) taking into account only pre-enactment interests.

**(B) Pre-enactment interest.**--

**(i) In general.**--The term "pre-enactment interest" means any interest in a passive activity held by a taxpayer on the date of the enactment of the Tax Reform Act of 1986, and at all times thereafter.

**(ii) Binding contract exception.**--For purposes of clause (i), any interest acquired after such date of enactment pursuant to a written binding contract in effect on such date, and at all times

3352357.1

thereafter, shall be treated as held on such date.

**(iii) Interest in activities.**--The term "pre-enactment interest" shall not include an interest in a passive activity unless such activity was being conducted on such date of enactment. The preceding sentence shall not apply to an activity commencing after such date if--

**(I)** the property used in such activity is acquired pursuant to a written binding contract in effect on August 16, 1986, and at all times thereafter, or

**(II)** construction of property used in such activity began on or before August 16, 1986.

****

3352357.1