# In the United States Court of Federal Claims

No. 02-1041 T
No. 04-1598 T
(Consolidated)
Filed September 23, 2008
TO BE PUBLISHED

| | |
|---|---|
| LYMAN F. BUSH, *et al.*, | ) Internal Revenue Code of 1986 (I.R.C.); |
| | ) interpretation of Closing Agreement under |
| | ) I.R.C. § 7121; passive activity losses; |
| Plaintiffs, | ) suspended losses; offsetting suspended passive |
| | ) losses against income generated by non-passive |
| | ) activities; relationship of I.R.C. § 465 to I.R.C. |
| v. | ) § 469 |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

Thomas E. Redding, Redding & Associates, P.C., Houston, Texas, for plaintiffs.

Benjamin C. King, Jr., Attorney of Record, Mary M. Abate, Assistant Chief, David Gustafson, Chief, Court of Federal Claims Section, Nathan J. Hochman, Assistant Attorney General, United States Department of Justice, Washington D.C., for defendant.

**OPINION AND ORDER**

GEORGE W. MILLER, Judge.

This case is one of approximately thirty lawsuits brought by partners in various partnerships marketed by the Greenberg Brothers Partnership. Two of those cases, *Bush v. United States*, No. 02-1041 T (consolidated with No. 04-1598 T) and *Shelton v. United States*, No. 02-1042 T (consolidated with No. 04-1595 T), were selected for briefing and representative resolution. *Bush v. United States*, 78 Fed. Cl. 76, 77 (2007).[1]

After a prior decision and a number of stipulations, a single, narrow issue remains for decision: the proper interpretation of two sentences contained in closing agreements between plaintiffs and defendant. The parties have filed cross-motions for summary judgment,

---

[1] On this date, the Court will enter orders in both the *Bush* and *Shelton* cases resolving the motions for summary judgment in each case in the same way for identical reasons.

appropriate here because, as the parties agree, "there is no genuine issue as to any material fact." Court of Federal Claims Rule 56(c). Because interpretation of a contract term is a question of law, this case may be resolved on summary judgment unless the contract term is ambiguous. *Sterling, Winchester & Long, L.L.C. v. United States*, 2008 WL 3892157, at *3 (Fed. Cl. Aug. 20, 2008).

The factual background is set forth in Judge Bruggink's earlier opinion in this case, *Bush v. United States*, 78 Fed. Cl. 76 (2007). Only those facts necessary to the resolution of the present motions are recounted here.

Plaintiffs were limited partners in two Greenberg Brothers partnerships named, respectively, Lone Wolf McQuade and Cinema 84. In 1991, the Internal Revenue Service ("IRS") issued Notices of Final Partnership Administrative Adjustment for each partnership, disallowing deductions reported on tax returns for various years between 1983 and 1989. *Id.* at 77. The partner charged with handling tax matters for each entity then filed petitions with the United States Tax Court challenging the IRS's proposed adjustments, and the plaintiffs elected to participate in those proceedings. *Id.*

On August 7, 1999, plaintiffs and the IRS entered into two separate Form 906 Closing Agreements on Final Determination Covering Specific Matters ("Closing Agreements"), settling the dispute between them. The Tax Court then dismissed plaintiffs from the pending court proceedings. *Id.* These Closing Agreements set forth certain agreed resolutions of the amount of plaintiffs' capital contribution, their amount at risk, and the amount available to offset partnership losses under I.R.C. § 465.

On November 23, 1999, plaintiffs filed refund claims with the IRS for tax years 1988, 1990, 1991, 1992, 1993, and 1995. (Ultimately, all that is relevant here are the requested refunds for 1988, 1990, 1991 and 1993 that were based on the method of using suspended passive losses from years covered by the Closing Agreement to offset income from non-passive activities. Def.'s Reply Br. at 6 (docket entry 99, August 15, 2008)). While these refund claims were still pending, the IRS issued notices of adjustment, showing adjustments it made to plaintiffs' allowed losses in the 1985, 1986 and 1987 tax years and assessing additional amounts due for those years. *Bush*, 78 Fed. Cl. at 77.

After paying these new assessments and being denied a refund by the IRS, plaintiffs filed suits in this court, contending, in case No. 04-1598, (1) that the further assessments for 1985, 1986 and 1987 were invalid because the IRS did not issue statutory notices of deficiency before the assessments; (2) those assessments were made after the expiration of the limitations period; and, in case 02-1041, (3) the IRS improperly refused the refunds for 1988, 1990, 1991, 1992, 1993 and 1995 based on suspended losses and tax credits pursuant to the Closing Agreements. Pls.' Motion to Sever and Stay (docket entry 77, March 31, 2008). Plaintiffs and defendant then filed cross-motions for summary judgment on the first issue, namely, plaintiffs' contention that the IRS did not provide proper notice because the amount at risk was a "nonpartnership item"

requiring a statutory notice of deficiency before any additional amount was assessed. *Id* at 79. They argued that due to this improper notice they were entitled to a refund of the additional amounts assessed. *Id.*

On August 17, 2007, Judge Bruggink rejected plaintiffs' claims, ruling that the IRS was not required to issue a statutory notice of deficiency before assessing additional tax and interest resulting from a settlement. *Id.* at 82. In October of that year, the case was reassigned to this chambers. Following discovery, plaintiffs withdrew their second argument, that the assessments had been made after the expiration of the limitations period. Pls.' Status Report at 2 (docket entry 74-1, March 18, 2008). This concession resolved the last of the issues in case number 04-1598, which had been consolidated with case number 02-1041. *Id.* Still at issue in case number 02-1041, however, was whether the IRS had properly refused to issue refunds based on suspended losses and tax credits pursuant to the Closing Agreements.[2] This Court denied a motion to sever those claims, and set a schedule for cross-motions for summary judgment on the remaining issues. Order (docket entry 80, April 23, 2008). The defendant filed the expected motion for partial summary judgment. Defendant's Cross-Motion for Partial Summary Judgment (docket entry 86, June 13, 2008). Plaintiffs, however, filed a "Motion for Partial Summary Judgment in Favor of the United States" (docket entry 93, June 24, 2008), seemingly seeking to concede the remaining issues as to case number 02-1041, but to preserve the disputes for litigation in the related, stayed cases. The Government opposed that motion, arguing that these cases had been selected to test the plaintiffs' theories of recovery, and allowing concession of the issues in 02-1041 alone would defeat the purpose of a representative litigation. Def.'s Opposition to Plaintiffs' Motion for Summary Judgment in Favor of the United States (docket entry 94, June 30, 2008).

In their Response to the United States' Cross-Motion for Partial Summary Judgment (docket entry 95, July 17, 2008), plaintiffs clarified that they did intend to concede certain issues for both the instant litigation and the related, stayed litigation. The parties memorialized these concessions in a Joint Stipulation As To Remaining Issues in the Related Greenberg Brothers Partnerships (docket entry 100, Aug. 26, 2008).[3] Pursuant to the joint stipulation and

---

[2] Claims alleging a failure to allow refunds for 1995 based on a provision of the Closing Agreements that there would be "no changes" to partnership items were voluntarily dismissed. Pls.' Motion to Sever and Stay at 2 & n.1 (docket entry 77, March 31, 2008).

[3] In brief, the stipulations were as follows: (1) the capital contributions made in 1995 were not cash contributions and, pursuant to the Closing Agreements, did not increase the taxpayers' amount at risk; thus, any suspended at-risk losses otherwise available could not offset partnership or other income for 1995; (2) the Closing Agreements "do not support the taxpayers' claims that any increases to the taxpayers' amounts at risk pursuant to the terms of the Closing Agreements would increase the amounts of the qualified investment for computing investment tax credits . . . . Therefore, the taxpayers' refund claims based on a claim for additional investment tax credits are not allowable"; (3) with respect to a specific partnership, Summer

representations of counsel at the status conference of August 7, 2008, the Court understands that a single issue remains for resolution in these consolidated cases: whether the Closing Agreements permit plaintiffs to receive a refund based upon offsetting income generated from non-passive activities with passive activity losses previously disallowed by I.R.C. § 465. The parties declined the opportunity to provide additional briefing on this topic, choosing to stand on their previously submitted materials.

This sole remaining dispute relates to the interpretation of Paragraph 6 of the Closing Agreements. The pertinent two sentences in each Closing Agreement read as follows:

> Any losses disallowed under this agreement are suspended under I.R.C. § 465. Such suspended losses may be used to offset the taxpayers' pro rata share of any income earned by the partnership and/or other income in accordance with the operation of I.R.C. § 465.

Exs. 7 & 8 to Def.'s Proposed Findings of Uncontroverted Fact (June 16, 2008, docket entry no. 88).

Both plaintiffs and defendant contend that the contract clearly and unambiguously supports their respective positions. Plaintiffs argue that the last sentence states that "suspended losses may be used to offset '**any income** earned by the partnership **and/or other income**' and should be given its literal meaning. Therefore, the deduction for the loss should not be restricted to being taken only against passive income." Pls.' Response at 3 (docket entry 95, July 17, 2008) (emphasis added). That is, losses previously disallowed by § 465 can be used to offset any income, irrespective of the passive activity restrictions contained in I.R.C. § 469. In plaintiffs' words, "[t]hose were specific terms in the Closing Agreement and the term 'any' modifies 'other income' and should be given its clear unrestricted meaning." *Id.* Under plaintiffs' interpretation, therefore, the Closing Agreements allow them to offset income generated from non-passive activities with passive activity losses.

The Government counters that the Closing Agreements provide that the offset may be used "in accordance with the operation of I.R.C. § 465." Def.'s Reply Br. at 5 (docket entry 99, August 15, 2008). As discussed below, § 465 governs permissible offsets based upon the amount a partner is at risk with respect to the partnership. The Government proffers that because offsets under § 465 are always subject to the terms of § 469, which forbids offsetting income generated by non-passive activities with passive activity losses, and the Closing Agreements do not specifically declare § 469 inapplicable, any losses disallowed but suspended under Paragraph 6

---

Lovers, there were no suspended losses "under . . . unique facts related to the Bushes"; (4) "Plaintiffs are not entitled to recover any refund based on the allegation that the assessments in question were actually entered on a later date than that reflected in the IRS transcripts." Joint Stipulation As To Remaining Issues in the Related Greenberg Brothers Partnerships at 1-2 (docket entry 100, Aug. 26, 2008).

are nonetheless subject to the restrictions of § 469. *Id.*

Evaluating the merits of these competing claims requires some review of, first, the relationship of I.R.C. sections 465 and 469, and second, the standards applicable to interpretation of closing agreements.

### Operation of Section 465 in Relation to Section 469

    *a.*    *Section 465*

I.R.C. § 465 permits a taxpayer to deduct losses incurred by an entity in which the taxpayer has invested (such as a partnership) only to the extent she is at risk with respect to that investment in that tax year. FRANK WOZNIAK, 5 MERTENS LAW OF FED. INCOME TAX'N § 24B:1. This rule prevents taxpayers from deducting substantially greater losses than they could actually have sustained from the investment. *Id.* ("[T]he at-risk limitation was adopted to curb the exploitation of tax shelters through the use of deductions based on nominal investments without risk of economic loss for the taxpayer.").

If the losses exceed the at-risk amount, the excess cannot be deducted in that tax year. The disallowed losses can, however, be "suspended"—that is, deferred and deducted in a future tax year, if the taxpayer is sufficiently at risk. *Id.* ("To the extent that the loss exceeds the amount at risk, the excess is not deductible in the current year, but is carried over, indefinitely, until absorbed by amounts at risk in later years.").

    *b.*    *Section 469*

In the Tax Reform Act of 1986, Congress prohibited taxpayers from using losses from passive activities to offset income from non-passive activities. I.R.C. § 469(a). An activity is "passive," as is relevant here, if the taxpayer does not "materially participate" in the activity. § 469(c)(1). Congress intended this reform to give the tax benefit of offsetting income "primarily to taxpayers with a substantial and *bona fide* involvement in the activities" that sustained the loss. S. Rep. No. 99-313, May 29, 1986, at 716. Thus, losses from passive activities are generally not allowed as a deduction for the year in which they are sustained, except to the extent of passive activity income. § 469(a).

    *c.*    *Order of Calculation*

The passive activity restrictions under § 469 are applied after the at-risk limitations of § 465. Treas. Reg. 1.469-2T(d)(6)(iii); S. Rep. No. 99-313, May 29, 1986, at 723 ("The determination of whether a loss is suspended under the passive loss rule is made after the application of the at-risk rules and the interest deduction limitation, as well as other provisions relating to the measurement of taxable income."); AMELIA LEGUTKI, 5 MERTENS LAW OF FED. INCOME TAX'N § 24C:85 ("Only when the general basis and at-risk basis rules are satisfied is a

determination made of whether a loss is suspended under the passive activity loss rules."); WILLIAM S. MCKEE, ET AL., FEDERAL TAXATION OF PARTNERSHIPS AND PARTNERS ¶ 11.08[3] ("If a loss is subject both to the passive loss rules and to other restrictions that limit deductions or losses, the passive loss rules are applied last. In other words, before applying the passive loss limitation, a loss or deduction must first be otherwise allowable under § 465 (the at-risk rules) and § 704(d) (limiting a partner's share of partnership loss to the outside basis of his interest).[4] All corresponding adjustments required by §§ 465 (at-risk amount) and 705 (basis) are, however, made even though the loss is suspended under the passive loss rules.").

If the taxpayer is not sufficiently at risk to take the loss in a particular tax year, the amount of the loss is suspended under § 465. S. Rep. No. 99-313, May 29, 1986, at 723. If the taxpayer's amount at risk in later years would allow deducting the suspended loss, the passive activity rule of § 469 is applied in that later year. *Id.* ("Such amounts may become subject to the passive loss rule in subsequent years when they would be allowable under the at-risk or interest limitations.").

### Standards Applicable to Closing Agreements

I.R.C. § 7121(a) allows the Government to enter into agreements in writing with taxpayers resolving their tax liability in any given period. These agreements are binding on the parties as to the matters agreed upon and cannot be annulled, modified, set aside or disregarded in the absence of a showing of fraud, malfeasance or misrepresentation of a material fact. *Id.* §7121(b). In an oft-repeated phrase, "[t]he purpose of the statute authorizing closing agreements is to enable the taxpayer and the government finally and completely to settle all controversies in respect of the tax liability" for the relevant taxable year. *Wolverine Petroleum Corp. v. Comm'r*, 75 F.2d 593, 595 (8th Cir. 1935).

Agreements settling tax disputes are contracts to be interpreted under general principles of contract law. *LaRosa's Intern. Fuel Co. Inc. v. United States*, 73 Fed. Cl. 625, 628 (2006). The agreements at issue in this case were on Form 906, which is used "where there is an agreement as to a specific matter affecting tax liability." *Zaentz v. Comm'r*, 90 T.C. 753, 761 (1988). This type of agreement binds the parties as to the matters agreed upon, but does not bind the parties as to the "premises underlying their agreement." *Id.*

From time to time, either the Government or a taxpayer will challenge a closing

---

[4] A partner's outside basis represents the partner's share of the partnership assets: the value of her investment adjusted for income, losses and distributions. I.R.C. § 705. The outside basis will differ from the at-risk amount if, for example, the partnership has non-recourse debt. The value of the partnership (and thus the partner's share) is reduced by the non-recourse debt, but the partner is not personally at risk if that debt is not satisfied. JAMES E. SMITH, WILLIAM H. RAABE, & DAVID M. MALONEY, WEST FEDERAL TAXATION 2007: TAXATION OF BUSINESS ENTITIES ex. 11.38 & 11.39 (2007), *available at* 2006 WL 4560419.

agreement on the grounds that it prevents the operation of a provision of law not specifically mentioned in the agreement. For example, in *Smith v. United States*, 850 F.2d 242 (5th Cir. 1988) (Wisdom, J.), the taxpayer argued that a closing agreement finally determined its losses, and the IRS could not assess penalties and interest by operation of law on the amounts contained in the closing agreement. The taxpayer lost, because "the limited scope of the closing agreement," which did not address penalties and interest, "does not make it ambiguous . . . because the calculation of taxable income and the assessment of penalties and interest are provided for by law." *Id.* at 245; *Last v. United States*, 37 Fed. Cl. 1 (1996) (declining to infer a term waiving a statute of limitations).

Similarly, in *Ewing v. United States*, 914 F.2d 499 (4th Cir. 1990), the Government claimed that a closing agreement precluded the taxpayer from recovering amounts that would otherwise qualify as overpayments under I.R.C. § 6401. The court noted that "[t]he closing agreements executed by taxpayers simply agreed to the amount of income, gains, losses, deductions and credits attributable to various businesses in which taxpayers were partners. They did not agree that they would abstain from claiming any refund that might be available to them under § 6401." *Id.* at 505 (internal citations and quotations omitted).

*In re Spendthrift Farm*, 931 F.2d 405 (6th Cir. 1991) also addresses this question. The taxpayer argued that the "plain language of the closing agreement constituted an explicit waiver by the IRS of its statutory right to restricted interest." *Id.* at 407. But the court held that "while there is no 'magic words' requirement for the closing agreement to cut off the IRS's claim for restricted interest, there must be a specific waiver in the closing agreement." *Id.*

**Paragraph 6 of the Closing Agreements Did Not Negate**
**Application of the Passive Loss Restrictions of I.R.C. § 469**

The teaching of these cases is that a closing agreement will not implicitly preclude the imposition of otherwise applicable law. If the parties intend that a law will not apply, they must explicitly agree on that point in the closing agreement. *Estate of Magarian v. Comm'r*, 97 T.C. 1, 6-7 (1991). No such provision appears in these Closing Agreements. Plaintiffs argue that "[t]he terms of the Closing Agreement were drafted by the Government and if there is a question then under general contract principals (sic) they should be interpreted favorably to the taxpayer." Pls.' Response at 3 (docket entry 95, July 17, 2008). The doctrine of *contra proferentem*, however, only applies where the contract language is ambiguous, *Temple v. United States*, 11 Cl. Ct. 302, 305 (1986)—and both plaintiffs and defendant argue that the contract is not ambiguous. As in *Temple*, this Court concludes that although "the closing agreement is not a paradigm of clarity, it cannot be characterized fairly as ambiguous or inconsistent." *Id.* Thus, the plaintiffs cannot "sponsor an intent inconsistent with unambiguous language." *Id.*

Plaintiffs do not contend that they are active investors in the relevant partnerships, or that the losses they seek to use to offset income are anything other than passive losses. Their argument, as set forth above, is that the sentence in the Closing Agreements allowing losses

suspended under § 465 to offset "**any income** earned by the partnership **and/or other income**" must be "given its literal meaning." Pls.' Response at 3 (docket entry 95, July 17, 2008) (emphasis added).

But this inferential reading does not support a finding that the parties specifically waived the operation of § 469. Paragraph 6 of the Closing Agreements addresses the amount at risk under § 465,[5] declaring that certain partnership liabilities were not amounts at risk for the partners, thus decreasing the amount of loss the partners might be able to claim for that year. But the agreement then permits losses disallowed under the Closing Agreement to be suspended consistent with § 465. That suspension meant, of course, the disallowed losses could be deducted in a future tax year if the partner/taxpayer were sufficiently at risk in that year.

But Paragraph 6 does not mention § 469, and losses suspended under § 465 are subject to the passive loss restrictions of § 469 in whatever future year the taxpayer attempts to use them. S. Rep. No. 99-313, May 29, 1986, at 723. The passive loss restrictions have an entirely different aim from the at-risk rules—namely, preventing taxpayers from using passive activity losses to offset income generated from non-passive activities. It is a stretch to assume that an agreement about the amount at risk is also an agreement on the entirely different topic of active versus passive losses, or that the words "any income" subvert the purpose of § 469 by allowing what that statute specifically prohibits. It is reasonable to read Paragraph 6 as allowing these passively investing taxpayers to use the passive losses disallowed under the Closing Agreements to offset future passive income, either from the taxpayers' passive investments in the partnerships or from other sources of passive income. *Hillman v. Comm'r*, 118 T.C. 323, 326 (2002) ("In particular, under the section 469 passive activity loss rules, income generated from nonpassive activities cannot be offset by deductions generated from passive activities."); AMELIA LEGUTKI, 5 MERTENS LAW OF FED. INCOME TAX'N § 24C:4.

Moreover, as the Government points out, the Closing Agreements explicitly require that the offset be used "in accordance with the operation of I.R.C. § 465." Def.'s Reply Br. at 5 (docket entry 99, August 15, 2008). As noted above, one applies § 465, followed by § 469. Where § 469 is not specifically declared inapplicable, any offsets suspended under § 465 as

---

[5] For example, Paragraph 6 of the Cinema 84 agreement reads, in its entirety:

> The taxpayers are not at risk under I.R.C. § 465 for any partnership notes, entered into by the partnership to acquire rights in the motion pictures Terminator, Perfect Strangers, Special Effects, Return of the Living Dead, A Breed Apart, and Howling II, whether or not assumed by the taxpayers. Any losses disallowed under this agreement are suspended under I.R.C. § 465. Such suspended losses may be used to offset the taxpayers' pro rata share of any income earned by the partnership and/or other income in accordance with the operation of I.R.C. § 465.

Ex 8 to Def.'s Proposed Findings of Uncontroverted Fact (docket entry no. 88, June 16, 2008).

provided in Paragraph 6 are, in the ordinary course, then subject to the restrictions of § 469. *Id.*

At the time they signed the Closing Agreements, the plaintiffs knew that they had declared their partnership activity as passive; they knew that § 469 restricted the offset potential of passive activity losses; and they did not make clear in the Closing Agreement that they were attempting to avoid the application of § 469 and to apply passive activity losses where they would not, under the usually applicable law, be able to do so.  If they intended such a result, they needed to include specific language to that effect in the Closing Agreements.  *Estate of Magarian v. Comm'r*, 97 T.C. 1, 6-7 (1991) ("[I]f petitioners had intended to settle with respect to any of the possible additions to tax for the taxable year 1981, they should have insisted upon the inclusion of specific language to that effect in the Closing Agreement.  Without such language, and in the absence of an assertion by petitioners that the Closing Agreement should be set aside for fraud, malfeasance or misrepresentation of a material fact, the specific matters agreed upon by the parties must be respected.").  Plaintiffs' interpretation of Paragraph 6 is therefore untenable, and the losses the Closing Agreements suspended under § 465 are subject to the restrictions of § 469 in the years the taxpayers attempt to use them.

## Conclusion

Defendant's Cross-Motion for Partial Summary Judgment relating to the meaning of Paragraph 6 of the Closing Agreements is GRANTED, and plaintiffs' "Motion for Partial Summary Judgment in Favor of the United States" is GRANTED to the extent it concedes issues other than the interpretation of Paragraph 6.  Accordingly, plaintiffs' claims for refund for 1988, 1990, 1991 and 1993 are denied insofar as they are based on the deduction of passive activity losses against income from non-passive activities.  The Clerk is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

 s/ George W. Miller
GEORGE W. MILLER
Judge